

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUL 1 2 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA LEANNE HAMLIN, | Case No. CV 12-6369-JPR |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER AFFIRMING THE COMMISSIONER |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

## I.   PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed April 19, 2013, which the Court has taken

---

[1]   On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

1

1  under submission without oral argument.  For the reasons stated
2  below, the Commissioner's decision is affirmed and this action is
3  dismissed.

4  **II.  BACKGROUND**

5       Plaintiff was born on May 14, 1975.  (Administrative Record
6  ("AR") 106.)  She has a high-school education.  (AR 14.)  She has
7  worked as a cashier, fast-food employee, and housecleaner.  (AR
8  129.)

9       On May 19, 2009, Plaintiff filed applications for DIB and
10  SSI, alleging that she had been unable to work since April 25,
11  2008, because of mental illness.  (AR 106, 113, 128.)  After her
12  applications were denied, Plaintiff requested a hearing before an
13  Administrative Law Judge ("ALJ").  (AR 93-94.)  A hearing was
14  held on February 2, 2011, at which Plaintiff, who was represented
15  by a nonattorney representative, testified, as did a vocational
16  expert ("VE").  (AR 11-29.)  In a written decision issued
17  February 25, 2011, the ALJ found that Plaintiff was not disabled.
18  (AR 57-73.)  On June 1, 2012, the Appeals Council considered
19  additional evidence from Plaintiff's treating psychiatrist but
20  denied Plaintiff's request for review.  (AR 1-6.)  This action
21  followed.

22  **III. STANDARD OF REVIEW**

23       Pursuant to 42 U.S.C. § 405(g), a district court may review
24  the Commissioner's decision to deny benefits.  The ALJ's findings
25  and decision should be upheld if they are free of legal error and
26  supported by substantial evidence based on the record as a whole.
27  Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,
28  1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746

(9th Cir. 2007).   Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).   It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).   "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

## IV.   THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is

3

currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. 20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

disability is established.  <u>Id.</u>  If that happens or if the
claimant has no past relevant work, the Commissioner then bears
the burden of establishing that the claimant is not disabled
because she can perform other substantial gainful work available
in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at
828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

      B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since April 25, 2008.  (AR 62.)
At step two, the ALJ concluded that Plaintiff had the severe
impairments of impulse-control disorder, borderline intellectual
functioning, panic attacks, borderline personality disorder,
intermittent explosive disorder, psychosis, developmental
disability, obesity, depression, anxiety, and history of alcohol
and polysubstance abuse.  (<u>Id.</u>)  At step three, the ALJ
determined that Plaintiff's impairments did not meet or equal any
of the impairments in the Listing.  (AR 65.)  At step four, the
ALJ found that Plaintiff retained the RFC to perform a full range
of work at all exertional levels but with the nonexertional
limitations that she should be limited to simple, routine tasks
and minimal contact with the public and coworkers.  (AR 66.)
Based on the VE's testimony, the ALJ concluded that Plaintiff was
capable of performing jobs that existed in significant numbers in
the national economy.  (AR 67-68.)  Accordingly, the ALJ
determined that Plaintiff was not disabled.  (AR 68.)

**V.  DISCUSSION**

Plaintiff alleges that the ALJ erred in (1) rejecting the opinion of one of her treating psychiatrists, Nancy Smith, and (2) finding Plaintiff's subjective symptom testimony not credible.  (J. Stip. at 3.)

A.  The ALJ Properly Evaluated the Medical Evidence

Plaintiff contends that the ALJ failed to properly consider the opinions of treating psychiatrist Dr. Smith.  (J. Stip. at 3-8, 13-17.)  Remand is not warranted on that basis, however, because the ALJ provided legally sufficient reasons for according little weight to Dr. Smith's opinions.

1.  Applicable law

Three types of physicians may offer opinions in Social Security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)."  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).  When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id.  Further, the ALJ need not accept any medical opinion that conflicts with the physician's own treatment notes or the record as a whole.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that discrepancy between physician's notes and his assessment of limitations was "clear and convincing" reason for rejecting opinion); Connett v. Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (affirming ALJ's rejection of physician's RFC questionnaire because it was "not supported by his own notes" and "had multiple inconsistencies with all other evaluations" (alteration omitted)).

## 2. Relevant facts

On August 17, 2006, Plaintiff visited primary-care physician Dr. Joseph Ortiz. (AR 203.) He examined her and noted that she had "a history of anxiety and depression" but was currently "stabilized" on Zoloft and Trazodone.[3] (Id.) He also noted that she had been having "anger outrages along with chronic intermittent tension headaches, and these are stable." (Id.) She denied currently having headaches, visual symptoms, paresthesias,[4] weakness of extremities, or abrupt changes in behavior, and her mood was noted as "stable" with no "homicidality or suicidality." (Id.) Her vital signs and physical exam were normal. (Id.) Her neurological symptoms were noted as "[a]lert and oriented" with no acute deficits, and her headaches, anxiety, and depression were again noted as "stable." (Id.)

On October 3, 2006, social worker Victoria Roberts noted that Plaintiff's doctor, "Dr. A," had referred Plaintiff for

---

[3] Trazodone is a serotonin modulator used to treat depression. Trazodone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last updated June 26, 2013). Zoloft is a selective serotonin reuptake inhibitor used to treat depression, obsessive-compulsive disorder, panic attacks, and social anxiety disorder. Sertraline, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last updated June 26, 2013).

[4] Parasthesia is "a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body." Parasthesia Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last updated May 6, 2010). It is "usually painless and described as tingling or numbness, skin crawling, or itching." Id.

counseling and case-management services in connection with her participation in a drug diversion program and application for various government benefits, including SSI. (AR 206.) She wrote that Plaintiff's doctor described her as "developmentally delayed [and] currently experiencing [increased] 'rage[,]' [and] Zoloft is only limitedly helpful." (Id.) She noted that it appeared that Plaintiff "may need neurological eval. due to birth trauma [and] years of head injuries due to domestic violence [and] battery." (Id.)

On October 15, 2006, consulting psychiatrist Dr. Gabrielle Paladino performed a "comprehensive psychiatric evaluation" of Plaintiff. (AR 209.) She spent 40 minutes meeting with and examining Plaintiff. (AR 214.) She noted that Plaintiff complained of a history of panic attacks, but they were "getting better" over time. (AR 209.) Plaintiff described her mood as "up and down" depending on her stress level, and she complained about financial stressors. (AR 210.) Plaintiff stated that she was working as a caregiver for her mother and two other women and was also working as a housekeeper. (AR 210.) She "denied feeling helpless, useless, worthless, overwhelmed or hopeless" but "did endorse feeling frustrated about her current financial situation." (Id.) She recounted her history of drug and alcohol abuse but stated that she had not used drugs for approximately nine months and was attending a 12-step program. (Id.) When asked about her past medical history, Plaintiff "stated that she does not believe she has any serious or chronic medical problems." (AR 211.) Dr. Paladino noted that Plaintiff was alert and oriented, was a "sincere and reliable" historian, and

her memory was "intact."   (AR 212.)   She further noted that
Plaintiff was well groomed, her mood was "open, polite, pleasant,
and friendly," she "easily established good rapport with the
examiner," and her "affect was broad and appropriate to her
mood."   (Id.)   Plaintiff's speech was spontaneous, fluent, and
well modulated, and Plaintiff denied auditory and visual
hallucinations and suicidal or homicidal ideation.   (Id.)   There
was "no evidence of paranoid thought processes, grossly
delusional thinking, flight of ideas, tangentiality,
circumstantiality, thought blocking, word salad, grandiosity or
pressured speech."   (Id.)   Plaintiff also displayed "no unusual
psychomotor agitation or retardation" and "demonstrated good
humor throughout the interview."   (Id.)   Plaintiff's cognitive
functions were generally normal, though Plaintiff's "[i]nsight
into her condition and judgment appear to be marginal."   (Id.)
Dr. Paladino diagnosed Plaintiff as having "[p]anic attacks with
agoraphobia, very mild," and a history of polysubstance abuse and
dependence, and she assessed a current Global Assessment of
Functioning ("GAF") score of 65-70 and "highest GAF all year
same."[5]   (AR 212-13.)

    Dr. Paladino then assessed Plaintiff's functional
capacities.   She stated that Plaintiff's panic attacks "are mild

_____

    [5]   A GAF score represents a rating of overall
psychological functioning on a scale of 0 to 100.   See Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders
[hereinafter DSM-IV], Text Revision 34 (4th ed. 2000).   A GAF
score between 60 and 70 indicates "some mild symptoms (e.g.
depressed mood and mild insomnia) OR some difficulty in social,
occupational, or school functioning . . . but generally
functioning pretty well, has some meaningful interpersonal
relationships."   Id.

and were probably triggered by methamphetamine abuse" and had "correspondingly decreased in severity" since Plaintiff had stopped using illegal drugs. (AR 213.) She also noted that Plaintiff's disability application "alleged problems with anger, but there was no evidence of such a problem during today's interview." "If anything," Dr. Paladino noted, "the claimant was quite cordial and pleasant throughout today's interview." (Id.) Dr. Paladino noted that given Plaintiff's history of working as a caregiver and her presentation during the examination, Plaintiff "would be able to appropriately relate with, interact with and deal with others"; concentrate and pay attention for two-hour increments; process "at least two- or three-step job instructions"; and "respond to simple changes in a routine work setting and . . . engage in group, goal-directed activities at work, such as following safety regulations and attendance rules." (Id.) She concluded that Plaintiff would not be a "cause for fear or distraction" by others in the workplace and would be able to use public transportation to get to work, maintain basic standards of decency and personal hygiene, accept feedback from supervisors, and work in "close proximity to others" without "deteriorating into behavioral extremes." (AR 213-14.) Thus, Dr. Paladino concluded that Plaintiff was able to work, though her prognosis was "guarded" in light of Plaintiff's history of substance abuse. (AR 214.)

On June 27, 2008, Plaintiff's primary care was transferred to Dr. Robert Guerra. (AR 225.) He noted upon her first visit that Plaintiff's "problems began in 2005," after she "lost her father in 2004" and was "having suddenly stress triggers with

1  public contact, easily overwhelmed and aggravated." (Id.)  He
2  also noted that Plaintiff had been prescribed a combination of
3  Risperdal,[6] Trazodone, and Zoloft; she had "done well with the
4  combination and it has stabilized a lot of the anger that she has
5  experienced"; and she was no longer using illegal drugs or
6  alcohol.  (Id.)  Plaintiff's physical examination was normal, and
7  the doctor noted that she "has had good response to her
8  medications" for her psychiatric issues.  (Id.)

9      On August 22, 2008, Plaintiff visited Dr. Guerra to request
10  a referral to a psychiatrist for medication management.  (AR
11  221.)  Dr. Guerra noted that Plaintiff had last been under
12  psychiatric care in 2007 and that she had been diagnosed with "a
13  mood disorder, depression, borderline intellectual functioning,
14  borderline personality disorder, methamphetamine use, [and]
15  impulse control disorder."  (Id.)  He noted that Plaintiff did
16  not feel "completely stable" with her current medication, though
17  she had "some positive effect" from her medications and denied
18  active suicidal ideations.  (Id.)  He referred Plaintiff to
19  psychiatry at her request, to follow up on treatment of "her
20  depression, intermittent explosive disorder and to have a
21  psychiatrist further refine her treatment."  (Id.)

22      On June 5, 2009, Plaintiff was evaluated by a social worker
23  with the Santa Barbara County Alcohol, Drug and Mental Health
24  Department.  (AR 229-36.)  He noted that Plaintiff complained of
25
26
27      [6]    Risperdal is an antipsychotic medication used to treat
symptoms of schizophrenia and bipolar disorder.  Risperidone,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
28  a694015.html (last updated June 26, 2013).

1  auditory hallucinations telling her to kill her mother or
2  herself, though she denied any suicidal or homicidal intent.  (AR
3  231, 233.)  He noted that Plaintiff had a history of drug and
4  alcohol abuse, had suffered a head injury from domestic abuse by
5  her ex-boyfriend in 2005, and had developmental delays caused by
6  being born with her umbilical cord wrapped around her neck.  (AR
7  231.)  He noted with respect to her mental status that Plaintiff
8  was oriented and did not suffer from delusions, compulsions,
9  obsessions, or ideas of reference, but she did have auditory
10  hallucinations, a depressed and anxious mood, and a shallow
11  affect.  (AR 234.)  Plaintiff reported unspecified memory
12  problems, but her thought processes were logical and coherent,
13  her speech was normal, and her judgment and insight were fair.
14  (AR 235.)

15      On July 14, 2009, Plaintiff was evaluated by consulting
16  psychiatrist L. Leaf.  (AR 237.)  Dr. Leaf noted that Plaintiff
17  had the impairments of "mood disorder NOS" and anxiety with
18  "recurrent severe panic attacks."  (AR 241-42.)  Plaintiff was
19  noted to have mild restriction of her activities of daily living,
20  mild difficulties in maintaining social functioning, moderate
21  difficulties in maintaining concentration, persistence, or pace,
22  and no episodes of decompensation.  (AR 247.)  Dr. Leaf reviewed
23  and summarized the medical evidence and noted that Plaintiff was
24  able to clean, cook, socialize, and care for her personal needs,
25  and she also assisted her mother in all daily activities.  (AR
26  249.)  Dr. Leaf assessed that Plaintiff was able to perform
27  simple, repetitive tasks with normal supervision and would
28  "benefit from a low stress environment."  (Id.)  Dr. Leaf then

13

performed a mental RFC assessment, noting that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions, maintain attention and concentration, complete a normal workday and workweek without interruptions from psychological symptoms or an unreasonable number and length of rest periods, interact appropriately with the general public, and respond appropriately to changes in the work setting, but she was not significantly limited in any other aspects.  (AR 251-52.)  Dr. Leaf concluded that Plaintiff was able to understand and follow simple instructions, could perform routine tasks, had no limitations in social interactions or attendance, and could relate well to others and adapt to routine changes in the work environment.  (AR 253.)

On June 5, 2009, Plaintiff visited psychiatrist Dr. Jeffrey Davis at the county mental-health-services office.  (AR 266-68.) Dr. Davis noted Plaintiff's history of being born with her umbilical cord around her neck, domestic violence, and past drug use.  (AR 266-67.)  He noted that her "chief complaint" was hearing voices, which started in 2005 and told her to kill her mother and herself, though she did not act on their suggestions. (AR 266.)  He also noted that at some unspecified point in time, Plaintiff claimed to have tried to "play chicken with a semi-truck" but had jumped out of the way at the last minute.  (Id.) He noted that her symptoms included depressed mood, mood swings, insomnia, auditory hallucinations, and 60-pound weight gain. (Id.)  He described Plaintiff's demeanor as "alert" and "in no perceptible distress" and noted that she was dressed and groomed appropriately.  (AR 267.)  Plaintiff spoke normally, made good

14

eye contact, and was cooperative and engaged.  (Id.)  She was
oriented to person, place, time, and situation, and her affect
was broad, neutral, mood-congruent, and appropriate, though her
mood was somewhat contradictorily noted as euthymic, anxious,
dysphoric, dysthymic, depressed, and manic.  (Id.)  Plaintiff
showed no signs of psychotic ideation, misperception, delusion,
or suicidal or homicidal ideation, and her impulse control,
judgment, and insight were judged to be "fair to good."  (Id.)
Plaintiff's movements and ambulation were normal.  (Id.)  Dr.
Davis noted that Plaintiff had no history of "developmental or
educational difficulties."  (Id.)  He also noted that she had
"low normal intelligence" and that it created "employment
limitations which place [her] in lowest socioeconomic pay scale,
perhaps below what she might obtain if on disability."  (Id.)  He
concluded by noting that Plaintiff was "[p]sychiatrically
stable," though she continued to have "persistent psychotic
symptoms requiring medication modification"; her current
medications were noted as "well tolerated and are having no
apparent untoward effects."  (AR 268.)  He continued her current
medications and also prescribed Abilify.[7]  (Id.)

On August 17, 2009, Plaintiff again saw Dr. Davis.  (AR 263-
65.)  He noted that she had a "[d]epressed mood," but it was
"more level - [n]either terribly happy nor sad," she had no
recent suicidal ideations, and she was "better," with "50%

_____

[7]    Abilify is an antipsychotic medication used to treat
various mental illnesses, including schizophrenia and depression.
See Aripiprazole, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a603012.html (last updated June 26,
2013).

improvement." (AR 263.) Plaintiff's mood swings were "gone," she was "sleeping well," and her auditory hallucinations were ongoing but her "psychotic sym[p]toms [were] not as bothersome as before." (Id.) Dr. Davis noted that Plaintiff was exercising, had lost five pounds, and had "more energy with Abilify," and her anxiety was "good with sertraline and trazodone; no more panic attacks." (Id.) He noted that Plaintiff was alert, cooperative, and in no distress, and her psychiatric symptoms were normal. (Id.) He again concluded that Plaintiff was "[p]sychiatrically stable," and her "persistent psychotic symptoms" were well managed with medication. (AR 264.)

Notes from Plaintiff's visits to the county mental-health-services office between June and September 2009 for medication checkups and refills show that Plaintiff was "responding well" to her medications and reported feeling "less depressed." (AR 269-74.)

On October 12, 2009, Plaintiff visited Dr. Davis, who noted that Plaintiff, on her current medications, reported that her mood was "normal," denied broad fluctuations in mood, and reported being "on a more even keel" "but sometimes if she becomes overwhelmed, she also becomes frustrated and angry." (AR 299.) He noted that she was sleeping well and her auditory hallucinations had come back, but an increase in her dosage of Abilify "was helpful." (Id.) Plaintiff reported that she had not used illegal drugs in 22 months and had not had any panic attacks. (Id.) Plaintiff's behavior and mental status were normal. (AR 299-300.) Dr. Davis noted that Plaintiff was "[p]sychiatrically stable," and her symptoms were managed with

16

1   medication, which was "well tolerated."   (AR 301.)

2        On October 14, 2009, consulting psychiatrist Dr. K. Loomis

3   reviewed the record and found that Plaintiff was capable of

4   performing simple, repetitive tasks.   (AR 275-77.)

5        Plaintiff saw Dr. Davis again on February 12 and March 10,

6   2010, when her symptoms were again reported as stable and

7   controlled by her medications.   (AR 296-98, 316-17.)

8        On April 15, 2010, Plaintiff first saw psychiatrist Dr.

9   Nancy Smith, at the county mental-health-services office; Dr.

10  Smith appears to have taken over Plaintiff's case from Dr. Davis.

11  (AR 294-95.)   Plaintiff told Dr. Smith that she had been "hearing

12  voices and Dr. Davis got me regulated on some medication and I

13  don't hear them any more."   (AR 294.)   She described her mental

14  state as "I have my ups and downs, today I am OK."   (Id.)   Dr.

15  Smith noted that Plaintiff "takes care of" her mother and had

16  "filed for social security."   (Id.)   She also noted that

17  Plaintiff "stopped working due to not being able to work and deal

18  with the voices," but she "feels less depressed" after Dr. Davis

19  changed her medications.   (Id.)   Plaintiff admitted to drinking

20  "2-3 beers daily this past month" because she was "depressed and

21  lonely."   (Id.)   When asked about work, Plaintiff responded that

22  work "stressed [her] out," she was "unable to think of what she

23  can do for work," and she was "waiting for a court date for

24  disability."   (AR 295.)   Dr. Smith noted that in school,

25  Plaintiff was "in special ed with a learning disability . . .

26  with the slow learners."   (Id.)

27        Dr. Smith examined Plaintiff and found that she was

28  "oriented in all spheres," knew who the current president was,

"recalled 2/3 words at 5 minutes," and "was able to subtract serial threes with difficulty." (Id.) Plaintiff stated that she had last heard voices "a year ago," up until Dr. Davis put her on Abilify. (Id.) Dr. Smith then noted that Plaintiff "is a very low functioning individual and would never be able to compete on the open labor market." (Id.) She diagnosed Plaintiff with psychosis not otherwise specified, mood disorder not otherwise specified, alcohol abuse, a "mild developmental disability," and obesity and noted that it was "difficult for [Plaintiff] to care for her obese mother," who was in a wheelchair. (Id.) She assessed a GAF score of 40.[8] (Id.) Her prognosis was "[g]uarded for marked improvement"; she also noted that she "believe[d] [Plaintiff] needs SSI" because "[s]he is better now than before, but I do not believe that she could hold down a job due to her slowness and probable brain injury from the assault (bike thrown at her)." (Id.)

Plaintiff saw Dr. Smith again on June 29, 2010. (AR 292.) Dr. Smith noted that Plaintiff "is doing better than 2 months ago since I last saw her" and had started attending Alcoholics Anonymous meetings. (Id.) She noted that Plaintiff's concentration was better on Abilify but "still is not what it was before 2005." (Id.) Plaintiff was still taking care of her mother and reported "making a very small amount of money from"

---

[8] A GAF score of 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work[.])." See DSM-IV, supra note 5, at Text Revision 34.

doing so.   (AR 292-93.)   Plaintiff's affect was noted as
"cheerful," and she stated that she "no longer hears voices on
the Abilify."   (AR 293.)   Dr. Smith described Plaintiff as having
"a very sweet and innocent way about her."   (Id.)   In her
diagnosis, she noted that Plaintiff "is a very low functioning
individual and would never be able to compete on the open labor
market."   (Id.)

On October 5, 2010, Dr. Smith filled out a Mental Residual
Functional Capacity Questionnaire.   (AR 282-87.)   She stated that
she was seeing Plaintiff every three months for one hour at a
time.   (AR 282.)   She noted diagnoses of depression and psychosis
not otherwise specified, developmental disability, obesity, and a
current GAF of 50.[9]   (Id.)   She stated that Plaintiff heard
voices, which "decreased a little w/ Abilify - still hears some
voices, voices developed (onset) after beaten by [boyfriend]."
(Id.)   She stated that Plaintiff was "oriented in all spheres"
and her prognosis was "guarded."   (AR 283.)   She checked boxes
indicating that Plaintiff had the symptoms of "anhedonia or
pervasive loss of interest in almost all activities," "appetite
disturbance with weight change," "decreased energy," "thoughts of
suicide," "blunt" and "inappropriate" affect, "feelings of guilt
or worthlessness," "impairment in impulse control," "poverty of
content of speech," "generalized persistent anxiety," "mood
disturbance," "mild" difficulty thinking or concentrating,

---

[9]   A GAF score of 50 indicates "serious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational,
or school functioning (e.g., no friends, unable to keep a job)."
See DSM-IV, supra note 5, at Text Revision 34.

1   "recurrent and intrusive recollections of a traumatic experience,
2   which are a source of marked distress," "mild" retardation,
3   pathological passivity, persistent disturbances of mood, "mild[]"
4   seclusiveness, "mild" isolation, hallucinations or delusions with
5   "some voices," and "very mild" memory impairment.  (Id.)  In the
6   category, "Loss of intellectual ability of 15 IQ points or more,"
7   she wrote, "it appears that way?"  (Id.)

8       Dr. Smith indicated that Plaintiff's "psychological or
9   behavioral abnormalities" were associated with a "dysfunction of
10  the brain."  (AR 284.)  She indicated that Plaintiff's ability to
11  remember work-like procedures, understand and remember very short
12  and simple instructions, ask simple questions or request
13  assistance, accept instructions and respond appropriately to
14  criticism from supervisors, and get along with coworkers or peers
15  without unduly distracting them or exhibiting behavioral extremes
16  was "limited but satisfactory"; Plaintiff's ability to carry out
17  very short and simple instructions, maintain attention for two-
18  hour segments, respond appropriately to changes in a routine work
19  setting, deal with normal work stress, and be aware of normal
20  hazards and take appropriate precautions was "seriously limited,
21  but not precluded"; Plaintiff's ability to maintain regular
22  attendance and be punctual within customary, usually strict
23  tolerances, sustain an ordinary routine without special
24  supervision, work in coordination with or proximity to others
25  without being unduly distracted, make simple work-related
26  decisions, and complete a normal workday and workweek without
27  interruptions from psychologically based symptoms was "unable to
28  meet competitive standards"; and Plaintiff had "no useful ability

to function" with respect to being able to perform at a
consistent pace without an unreasonable number and length of rest
periods.  (Id.)  She stated that Plaintiff would "become
frustrated and angry" if she were pressured at work, had "trouble
sticking to chores at times," "believes she makes wrong decisions
a lot of the time," and had "poor" self-esteem.  (AR 285.)  She
indicated that Plaintiff was "unable to meet competitive
standards" to understand, remember, and carry out detailed
instructions, set realistic goals, or make plans independently of
others, and she had "no useful ability to function" in dealing
with the stress of semiskilled or skilled work.  (Id.)  She noted
that Plaintiff had "unlimited or very good" ability to adhere to
basic standards of neatness and cleanliness, "limited but
satisfactory" ability to maintain socially appropriate behavior,
"seriously limited but not precluded" ability to interact
appropriately with the general public, "unable to meet
competitive standards" in her ability to travel to an unfamiliar
place, and "no useful ability to function" in her ability to use
public transportation because she "dislikes being around a lot of
people."  (Id.)  She noted that Plaintiff "once tried to play
chicken w/ a truck + jumped in front of it."  (Id.)  She
indicated that Plaintiff had "a low IQ or reduced intellectual
functioning," but when asked to refer to specific test results,
she wrote "none done here."  (AR 286.)  She indicated that
Plaintiff's impairments would cause her to be absent from work
more than four days a month.  (Id.)  She noted that Plaintiff
would have difficulty working on a sustained basis because she
was "irritable, stressed out and overwhelmed" and "could not do

1   more than 1 task." (Id.)

2          On October 10, 2010, Plaintiff again saw Dr. Smith.  (AR
3   289.)  Dr. Smith noted that Plaintiff had stopped attending AA
4   meetings "because I think I have a lazy streak in me," but she
5   was not drinking.  (Id.)  She stated that she was hearing voices
6   "off and on," but they were not as strong as they used to be.
7   (Id.)  Plaintiff was "overwhelmed by having to do everything for
8   her mother."  (Id.)  Plaintiff reported that she stopped working
9   in 2005, after her ex-boyfriend hit her in the head with a
10  bicycle frame, "due to not being able to work and deal with the
11  voices."  (AR 289-90.)  She stated that she was "waiting for a
12  court date for disability."  (AR 290.)  Dr. Smith noted that
13  Plaintiff "laughs easily, but at times it seems a little
14  inappropriate," "complains of chronic low energy 'lazy and
15  irritable,'" had considered suicide "in the recent past" but had
16  "no active [suicidal ideation]," had auditory hallucinations
17  telling her to hurt herself and her mother but was "ignoring the
18  voices," knew the name of the president and governor but "like
19  most people, [s]he could not recall the name of the vice
20  president," could recall "3/3 words at 10 minutes," and
21  "believe[d] it [was] her living situation" with her mother "that
22  has affected her mood."  (Id.)  Dr. Smith helped Plaintiff fill
23  out an SSI form and noted that Plaintiff spent a "[l]ong time"
24  filling out the form; she also noted that she "believe[d]
25  [Plaintiff] needs SSI and with that could perhaps find a
26  protected part time job" and that "[f]illing out the SSI form
27  brought out how really disabled she is."  (Id.)
28          Notes from Plaintiff's visits to the county mental-health-

1  services office between April and September 2010 for medication
2  checkups and refills show that Plaintiff was "responding well" to
3  her medications and "denie[d] most [symptoms] of depression or
4  anxiety at present."   (AR 302-14.)

5      On January 27, 2011, Plaintiff again visited Dr. Smith.  She
6  discussed having "head pain . . . like my brain hurts all the
7  time" and said she was "still hear[ing] some voices."  (AR 332.)
8  Plaintiff discussed feeling anxious about the status of her SSI
9  application and reported that taking care of her mother was
10  "stressful."  (Id.)  Dr. Smith noted that Plaintiff "relates in a
11  child-like fashion," "has a difficult time processing
12  information," and "is not suicidal" but still heard voices.  (AR
13  333.)

14      On March 21, 2011, one month after the ALJ issued his
15  written decision, Plaintiff visited Dr. Smith.  (AR 335.)  She
16  discussed being "upset about having her disability overturned."
17  (Id.)  Dr. Smith made the following notations:

18        It appears that the term "psychiatrically stable" is
19      really  used  against  her.   Once  [sic]  can  be
20      "psychiatrically stable" and still not able to work.[]
21      It  basicaly  [sic]  means  that  she  is  stable  on  her
22      medications and not likely to get significantly better
23      and her functioning is such that she does not require
24      hospitalization.    Interestingly,  she  was  apparently
25      denied Social Security even when she was hearing voices.
26      The vocational worker stated she could wash dishes.  The
27      judge opined that she could work at limited simple tasks
28      with minimal contact with the public or coworkers.  My

sense is that this is only a step a way [sic] from a sheltered workshop. I believe her mental slowness would prevent her from getting hired on the open labor market.

. . .

She is oriented in all spheres. She is able to only do simple arithmetic on her fingers or counting out loud and is not able to subtract serial 7's. By counting out loud, she was able to subtract 20-3. Today she admits to hearing voices off and on, but they are not that bothersome. However, to state an opinion, I do not believe that this is what makes her unable to compete on the open labor market. It is more her limited intelligence. She is oriented in all spheres. She presents in a child-like fashion.

The thought processes are consistently slowed down and concrete and this is stable. She is living with her mother who pays the rent. She did recall 3/3 words at 5 minutes. Her overall affect is pleasant.

I continue to believe that Rhonda is a very low functioning individual and would never be able to truly compete on the open labor market. She is ALSO PSYCHIATRICALLY STABLE ie, she is NOT GOING TO CHANGE or improve. I believe she needs SSI and with that could perhaps find a protected part time job. As I noted before, it was sitting with this woman for two hours filling out the form that the level of her disability became apparent. I am accused of not being objective. However, I do not see anywhere else where serial 7's were

1  even attempted.  I do not believe that she could
2  negotiate rent.  Her thought processes are slowed down.
3  Would I hire her to clean for me?  Absolutely not.  Her
4  thinking is too slowed down.  I could easily find a more
5  competent laborer.  Could she work in a more sheltered
6  workshop where she is helped and supported?  Yes, but
7  does that mean she is not disabled?  I do not have the
8  answer for that.  That is for the judge to determine.  I
9  would note that GAF scores are subjective and the
10 difference between 40 and 50 is not that significant.
11 What is significant is her mental slowness and
12 difficulties with anthing [sic] beyond simple arithmetic.
13 She has wound up living on the street before.  Without
14 the support of her mother, this could occur again.  I
15 question whether she could accomplish all that is
16 necessary to find work and shelter in particular on her
17 own.  (She could probably obtain free food at churches.)
18 Once again, this really can only be a subjective
19 judgment.  In my case it is based on many years of
20 treating mentally ill people and seeing how they manage
21 (or don't manage) without support.

22 (AR 335-36.)

23          3.  Analysis

24      The ALJ found that Plaintiff could perform a full range of
25 work at all exertional levels, with the nonexertional limitations
26 that she should be limited to "simple, routine tasks with minimal
27 contact with public and co-workers."  (AR 66.)  Leading up to
28 that finding, the ALJ evaluated Dr. Smith's opinions as follows:

Progress notes from [the county mental-health-services department] from September 2009 to November 2010 encompass the continuing assessments from Dr. Jeffrey[10] and include more recent assessments from Dr. Nancy Smith. Dr. Jeffrey's [sic] continues to rate the claimant as being "psychiatrically stable" and GAF's of 50 on October 2009 and February 2010, respectively. Also, claimant reported on April 15, 2010 that she last heard voices a year ago and on June 28, 2010, that Dr. Davis got me regulated on some medication and I don't hear voices anymore. Follow up progress notes involving medication management from September 2009 to January 2010 and from April 2010 to November 2010 repeatedly report that the claimant is responding well to the medication regimen and has no suicidal ideation.

Dr. Nancy Smith, however, rated the claimant a GAF of 40 on June 28, 2010 and opined that the claimant could not hold down a job due to her slowness and probably [sic] brain injury from the assault. On October 5, 2010, Dr. Smith rated the claimant a GAF of 40 and opined that the claimant is low functioning and would never be able to compete on the open labor market. Similarly, on January 27, 2011, Dr. Smith again rated the claimant a GAF of 40 and would be unable to work. The undersigned affords these opinions very little weight as they are not based upon objective evidence and they are inconsistent

---

[10] The ALJ appears to have referred to Dr. Jeffrey Davis by his first name as well as his last.

with the numerous progress notes that indicate the claimant is "psychiatrically stable" and is responding well to her medication regimen as detailed above.

Lastly, Dr. Smith completed a "Mental Residual Functional Capacity Questionnaire" form on October 5, 2010. Dr. Smith noted the following diagnoses: depression, nos; psychosis, nos; developmental disability; obesity; and, a GAF of 50. Dr. Smith opined a very limited mental residual functional capacity for the claimant. Dr. Smith rated the claimant as either seriously limited, but not precluded, unable to meet competitive standards or no useful ability to function in 11 out of 16 categories of mental abilities needed to do unskilled work. The undersigned affords this opinion very little weight as it is not based upon objective evidence and it is inconsistent with the numerous progress notes that indicate the claimant is "psychiatrically stable" and is responding well to her medication regimen as detailed above. Furthermore, this medical source statement boarders [sic] on advocacy and appears to be based upon the subjective complaints of the claimant only.

(AR 64 (citations omitted).)

As an initial matter, the ALJ's RFC finding limiting Plaintiff to simple, routine tasks with minimal contact with the public and coworkers appears to accommodate many of Dr. Smith's concerns. For example, in her Mental RFC Questionnaire, Dr. Smith noted that Plaintiff had a "limited but satisfactory"

ability to understand and remember worklike procedures and very
short and simple instructions, ask simple questions or request
assistance, accept instructions and respond appropriately to
criticism from supervisors, and get along with coworkers or peers
without unduly distracting them or exhibiting behavioral
extremes, and she was "not precluded" from carrying out very
short and simple instructions and maintaining attention for two-
hour segments (AR 284); these limitations presumably would be
accommodated to some extent by the ALJ's RFC limitation to
simple, repetitive tasks and minimal contact with coworkers and
the public (AR 66).   Indeed, the ALJ appears to have given
Plaintiff great benefit of the doubt in limiting her to minimal
contact with coworkers and the public, as nearly all of the
medical evidence in the record, including Dr. Smith's notes,
shows that Plaintiff was pleasant, polite, friendly, and seemed
to get along well with others.   (See AR 211-13, 267, 293, 335-
36.)   In June 2010, Dr. Smith even described Plaintiff as
"cheerful."   (AR 293.)

     To the extent the ALJ rejected Dr. Smith's opinions, he
provided specific and legitimate reasons, supported by
substantial evidence, for doing so.   The ALJ correctly noted that
Dr. Smith's opinions conflicted with the "numerous progress
notes" in the record, including those from Plaintiff's other
treating psychiatrists, Dr. Davis and Dr. Ortiz, and those from
Dr. Smith herself, indicating that Plaintiff's symptoms were
stable and she was responding well to her medications.   (AR 64;
see AR 203-04, 209-14, 225, 263-64, 268, 269-74, 292, 294, 295,
296-98, 299-301, 302-14, 316-17); see Bayliss, 427 F.3d at 1216;

1    Connett, 340 F.3d at 874-75; see also 20 C.F.R.

2    §§ 404.1529(c)(3)(iv) (ALJ may consider effectiveness of

3    medication in evaluating severity and limiting effects of

4    impairment), 416.929(c)(3)(iv) (same); Warre v. Comm'r of Soc.

5    Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments

6    that can be controlled effectively with medication are not

7    disabling for the purpose of determining eligibility for [Social

8    Security] benefits."). Although Dr. Smith diagnosed Plaintiff

9    with a GAF score of 40 (AR 295), other doctors diagnosed her with

10    GAF scores of between 50 and 70 (AR 212-13, 282), and Dr. Smith

11    herself admitted that a GAF assessment was "subjective" and a

12    difference of 10 points was "not that significant" (AR 336). In

13    any event, GAF scores "[do] not have a direct correlation to the

14    severity requirements in the Social Security Administration's

15    mental disorders listings," and an ALJ may properly disregard a

16    low GAF score if other substantial evidence supports a finding

17    that the claimant was not disabled. See Doney v. Astrue, 485 F.

18    App'x 163, 165 (9th Cir. 2012) (alterations and citations

19    omitted).

20       The ALJ also permissibly rejected Dr. Smith's opinions that

21    Plaintiff would "never be able to compete on the open labor

22    market" and "needs SSI" because they were opinions on Plaintiff's

23    ultimate disability status, which the ALJ was not obligated to

24    accept. (AR 64); see 20 C.F.R. §§ 404.1527(d)(1) ("A statement

25    by a medical source that you are 'disabled' or 'unable to work'

26    does not mean that we will determine that you are disabled."),

27    416.927(d)(1) (same); SSR 96-5p, 1996 WL 374183, at *5

28    (treating-source opinions that a person is disabled or unable to

work "can never be entitled to controlling weight or given special significance"); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity.").

The ALJ was also permitted to discount Dr. Smith's limited-RFC findings and disability opinions because they were inconsistent with her own treatment notes. (AR 64); see Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports); Bayliss, 427 F.3d at 1216; Connett, 340 F.3d at 874-75. As the ALJ noted (AR 64), Dr. Smith's treatment notes stated that Plaintiff was doing "better" and responding well to her medication, and her auditory hallucinations had improved with medication. (See, e.g., AR 289-95, 332-33.) Such consistently normal or mild findings fail to support Dr. Smith's opinion that Plaintiff was so significantly disabled by her mental impairments that she was unable to, for example, maintain concentration, perform repetitive tasks, interact with coworkers, or complete a normal workweek without decompensating. (See AR 282-87.) Dr. Smith admitted that Plaintiff's auditory hallucinations were "not that bothersome" and were not the reason she felt Plaintiff was unable to work. (AR 335.) Instead, she stated that it was Plaintiff's "limited intelligence" that prevented her from working, even though she had earlier noted that no test results supported her findings that Plaintiff had a low IQ or reduced intellectual

functioning.  (AR 283, 286.)  Although Dr. Smith, in response to
the ALJ's opinion, stated that "psychiatrically stable" meant
only that Plaintiff's condition was unlikely to change (AR 335-
36), the medical evidence showed that she was in fact stable and
her symptoms were well controlled with medication.  The ALJ was
therefore entitled to reject Dr. Smith's RFC finding.  See Payne
v. Astrue, No. 3:11-cv-05320-BHS-KLS, 2011 WL 8878916, at *7
(W.D. Wash. Dec. 19, 2011) (finding that ALJ properly rejected
treating psychiatrist's opinion that plaintiff was severely
depressed because plaintiff "was found to be psychiatrically
stable later that month," noting that while doctor's statement
that plaintiff was "'psychiatrically stable' without any further
comment[] does not necessarily show [she] is without significant
functional limitations, but rather may merely indicate the
condition was unchanging at the time," doctor also noted at the
same time that "plaintiff was 'doing well on' her medication,"
"thus show[ing] that not only was plaintiff considered to be
doing well, but she was stable at that level"), accepted by 2012
WL 122867 (W.D. Wash. Jan. 17, 2012).  Moreover, the ALJ was
entitled to reject Dr. Smith's opinions to the extent they were
premised on Plaintiff's subjective complaints (AR 66), which, as
explained in section V(B) below, he properly rejected.  See
Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when
ALJ properly discounted claimant's credibility, he was "free to
disregard" doctor's opinion that was premised on claimant's
subjective complaints); Morgan v. Comm'r of Soc. Sec. Admin., 169
F.3d 595, 602 (9th Cir. 1999) (when physician's opinion of
disability premised "to a large extent" upon claimant's own

accounts of symptoms, limitations may be disregarded if
complaints have been "properly discounted").

The ALJ was also entitled to rely on the opinions of
consulting examiner Dr. Paladino and state-agency psychiatrists
Dr. Leaf and Dr. Loomis to reject Dr. Smith's opinions.  (AR 63,
67.)  As the ALJ noted, Drs. Paladino's and Leaf's opinions were
consistent with the objective evidence, including the opinions
and treatment notes of Plaintiff's other treating psychiatrist,
Dr. Davis, as well as with each other.  (AR 63-64); see Thomas,
278 F.3d at 957 ("The opinions of non-treating or non-examining
physicians may also serve as substantial evidence when the
opinions are consistent with independent clinical findings or
other evidence in the record."); see also 20 C.F.R. §§
404.1527(c)(4) (ALJ will generally give more weight to opinions
that are "more consistent . . . with the record as a whole"),
416.927(c)(4) (same).  For example, Dr. Paladino's findings that
Plaintiff was polite, pleasant, and friendly, her concentration
and attention were acceptable for two-hour increments, and she
would be able to process simple job instructions and respond to
simple changes in a routine work setting (AR 209-14) were
consistent with Drs. Davis's and Smith's findings in the
narrative reports that Plaintiff had a polite and friendly
demeanor, her symptoms were controlled with medication, and she
could perform simple tasks (see, e.g., AR 263-64, 268, 269-74,
292, 294, 295, 296-98, 299-301, 302-14, 316-17).  Dr. Leaf
similarly found that Plaintiff had moderate difficulties in
maintaining concentration, persistence, and pace; mild
restriction of activities of daily living and maintaining social

32

1  functioning; and no episodes of decompensation of an extended
2  duration.   (AR 247.)   And Drs. Paladino, Loomis, and Leaf
3  reviewed Plaintiff's full medical records before rendering their
4  opinions, which also supports the ALJ's finding that their
5  opinions were entitled to more weight.   (AR 214, 249); see 20
6  C.F.R. §§ 404.1527(c)(6) (extent to which doctor is "familiar
7  with the other information in [claimant's] case record" is
8  relevant factor in determining weight given to opinion),
9  416.927(c)(6) (same).   Dr. Smith, on the other hand, had been
10  treating Plaintiff for only six months and had apparently seen
11  her only a handful of times at the time she filled out the RFC
12  assessment, in October 2010, and there is no indication in the
13  record that Dr. Smith reviewed Plaintiff's full medical record
14  before rendering her opinion.   (See AR 282-87, 289, 292, 294.)
15  Although Dr. Paladino examined Plaintiff in October 2006, before
16  her alleged onset date of April 25, 2008, the medical evidence
17  shows that Plaintiff's condition did not change significantly
18  between 2006 and 2008.   Plaintiff reported that her problems
19  began in 2005, when she was abused by her ex-boyfriend, attempted
20  suicide by walking in front of a truck, and began hearing voices
21  (see AR 20-21, 187, 225, 231, 266, 289-90, 292); from 2006 on,
22  her doctors consistently reported that she was doing better on
23  medication, and she frequently denied hearing voices or having
24  any other symptoms of depression or anxiety (AR 263-64, 268, 269-
25  74, 292, 294, 295, 296-98, 299-301, 302-14, 316-17).   The ALJ's
26  reliance on Drs. Paladino's, Loomis's, and Leaf's opinions was
27  therefore proper.

28        Plaintiff also challenges the ALJ's rejection of Dr. Smith's

opinion on the ground that it "[borders] on advocacy."  (AR 64;
J. Stip. at 7-8.)  An ALJ may not reject a treating physician's
opinion based on the assumption that a treating physician has a
natural tendency to advocate for her patients but may do so if
there is evidence that the physician is in fact acting as an
advocate.  See Lester, 81 F.3d at 832 ("The [Commissioner] may
not assume that doctors routinely lie in order to help their
patients collect disability benefits" but "may introduce evidence
of actual improprieties . . . .");  Matney v. Sullivan, 981 F.2d
1016, 1020 (9th Cir. 1992) (holding that ALJ properly determined
treating physician's opinions "were entitled to less weight"
because evidence showed that physician "had agreed to become an
advocate and assist in presenting a meaningful petition for
Social Security benefits");  Saelee v. Chater, 94 F.3d 520, 522
(9th Cir. 1996) (ALJ properly discounted treating physician's
report obtained solely for purposes of administrative hearing);
Buckner-Larkin v. Astrue, 450 F. App'x 626, 627 (9th Cir. 2011)
(ALJ properly discounted treating physician's opinion on ground
that he "appeared to be more of an advocate than an objective
examiner" when finding was "supported by the record").  Here, the
ALJ's finding that Dr. Smith acted as an advocate was supported
by the record, and thus it was proper.  As the ALJ noted, Dr.
Smith's dramatically limited RFC finding was inconsistent with
the medical evidence, including her own treatment notes,
suggesting that it was not objective.  (AR 64.)  Dr. Smith
repeatedly noted the status of Plaintiff's disability
application, which she had helped Plaintiff fill out (AR 290),
and often stated that she believed Plaintiff "needs SSI," which

34

1  suggested an intent to advocate.  (See AR 290-95, 332-33.)

2  Indeed, after the ALJ issued his written decision, Dr. Smith

3  wrote another report specifically disputing the ALJ's conclusions

4  and reiterating her belief that Plaintiff should be awarded SSI

5  benefits.  (AR 335-36.)  The ALJ's rejection of Dr. Smith's

6  opinion because it "[bordered] on advocacy" was proper.  Matney,

7  981 F.2d at 1020; see also Bagoyan Sulakhyan v. Astrue, 456 F.

8  App'x 679, 682 (9th Cir. 2011) (ALJ properly rejected physician's

9  reports that "contained an advocate's tone rather than that of a

10  treating physician").

11      Plaintiff is not entitled to remand on this ground.

12      B.   The ALJ Properly Assessed Plaintiff's Credibility

13      Plaintiff argues that the ALJ failed to articulate clear and

14  convincing reasons for rejecting Plaintiff's subjective

15  testimony.  (J. Stip. at 17-19, 22-24.)  Reversal is not

16  warranted on this basis.

17      An ALJ's assessment of pain severity and claimant

18  credibility is entitled to "great weight."  See Weetman v.

19  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

20  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

21  believe every allegation of disabling pain, or else disability

22  benefits would be available for the asking, a result plainly

23  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

24  F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and

25  citation omitted).  In evaluating a claimant's subjective symptom

26  testimony, the ALJ engages in a two-step analysis.  See

27  Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must

28  determine whether the claimant has presented objective medical

evidence of an underlying impairment [that] could reasonably be
expected to produce the pain or other symptoms alleged." <u>Id.</u> at
1036 (internal quotation marks omitted).  If such objective
medical evidence exists, the ALJ may not reject a claimant's
testimony "simply because there is no showing that the impairment
can reasonably produce the *degree* of symptom alleged." <u>Smolen</u>,
80 F.3d at 1282 (emphasis in original).  When the ALJ finds a
claimant's subjective complaints not credible, the ALJ must make
specific findings that support the conclusion. <u>See</u> <u>Berry v.</u>
<u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative
evidence of malingering, those findings must provide "clear and
convincing" reasons for rejecting the claimant's testimony.
<u>Lester</u>, 81 F.3d at 834.  If the ALJ's credibility finding is
supported by substantial evidence in the record, the reviewing
court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at
959.

In two function reports dated May 30, 2009, Plaintiff stated
that her daily activities consisted of taking her medications,
cleaning up the apartment she shared with her mother, and going
for walks.[11]  (AR 135, 144.)  She also cooked meals for 30 to 45
minutes a day on a daily basis and fed and walked her dog.  (AR
136-37, 144-45.)  She spent approximately three to four hours
cooking, cleaning, and doing laundry each day and did not need
any help.  (AR 137, 146.)  She also did yard work and shopped for
food for about one hour once a month.  (AR 138, 145.)  She stated

---

[11]   The first form Plaintiff filled out is a Third Party
Function Report form, but Plaintiff filled it out herself.  (<u>See</u>
AR 135.)

that she went outside "all the time" and was able to go out
alone.  (AR 138, 146.)  She stated that she was not able to
handle money in any way because she did not have a job or bank
account.  (Id.)  She listed "hook and latch" as a hobby but noted
that she "can't read very good" and did not socialize often
except to attend mental-health therapy.  (AR 139-40, 147-48.)
She stated that she had difficulty with talking, hearing, memory,
completing tasks, concentration, understanding, and following
instructions; she could not follow written instructions "to [sic]
good"; and she "ha[d] to be reminded" to follow spoken
instructions.  (AR 140, 148-49.)  She stated that she
"respect[ed]" authority figures but did not handle stress and
changes in routine "to will [sic]."  (AR 141, 149.)

On September 27, 2010, Plaintiff responded to a series of
written questions regarding her ability to work.  (AR 183-90.)
She stated that she stopped working in "2006-2007" because she
was "unable to mentally handle [her] position."  (AR 184.)  She
had not looked for other work since then but had attended mental-
health counseling.  (Id.)  She lived with her mother and a
roommate "and [could] function daily"; her daily activities
included riding a bicycle, walking, doing crafts, and crocheting.
(Id.)  She socialized with her mother, a friend, a cousin, and
other family members.  (Id.)  She stated that since she filed her
disability claim, her condition had changed in the following
ways: "no concentration, suicidal tendencies, hallucination,
hyperactive."  (AR 185.)  She stated that she attended counseling
and was prescribed medications to address her symptoms.  (Id.)
She also stated that she suffered from chronic headaches but had

37

never seen a doctor for them, instead treating them with over-
the-counter medication.  (AR 186.)  She stated that she could
never lift, carry, or pull even 10 pounds, could stand or walk
for less than two hours in an eight-hour day, could not sit
without alternating positions, and was limited in her ability to
push and pull in both her upper and lower body.  (AR 187.)
Plaintiff stated that she was "always fatigued [and] irritable"
and suffered from panic attacks and anxiety caused by stress.
(AR 188.)  She stated that her medication "limits ability to
function."  (Id.)  She preferred to walk rather than use public
transportation because of "paranoia," did not interact well with
supervisors and coworkers, and was "confrontational" in dealing
with the public.  (AR 189-90.)  She stated that she was not able
to recall or comprehend technical or complex job instructions,
could not concentrate for any extended time, and could not deal
with daily pressures or "money issues."  (AR 190.)

At the February 2, 2011 hearing before the ALJ, Plaintiff
testified that she suffered from depression and had attempted
suicide once in the past two or three years but was not
hospitalized and did not go to an ER.  (AR 16.)  She stated that
she liked "to be with others" and was close to trusted family and
friends.  (Id.)  She stated that she heard voices telling her to
kill or hurt somebody and had panic attacks caused by stress.
(AR 17.)  She had not done drugs since 2006 and had not consumed
alcohol since 2006 except for one "binge" four months before the
hearing.  (AR 17-18.)  She lived with her mother and during the
day would get up and go outside for a cigarette, drink coffee,
walk her dog, and lie down in the afternoon because of chronic

38

headaches.   (AR 18.)   She did not take any medicine for the
headaches.   (Id.)   She watched TV and would read "every once in a
while," helped her mom clean the house, cooked "a little bit,"
did not "really" do any socializing, and could go "uptown" to do
grocery shopping by herself.   (AR 19.)

Plaintiff testified that her problems began in 2005, when
she was beaten by her ex-boyfriend and then attempted suicide by
walking in front of a truck.   (AR 20-21.)   She began hearing
voices after that.   (AR 20.)   She then began taking medications,
from which she had no side effects and which helped with her
hallucinations and "control[led] [her] moods."   (AR 20-24.)   She
stated that she had problems concentrating and remembering things
and would have panic attacks when stressed.   (AR 23-25.)   She
also claimed, apparently for the first time, to be having visual
hallucinations.   (AR 25.)   She last worked in 2006, "doing in-
home health services" for her mother and another lady.   (AR 23.)
She stated that being around people did not affect her panic
attacks or hallucinations.   (AR 25.)

The ALJ found that Plaintiff's impairments "could reasonably
be expected to cause the alleged symptoms," but her "statements
concerning the intensity, persistence and limiting effects of
these symptoms are not credible to the extent they are
inconsistent with" Plaintiff's RFC.   (AR 67.)   He noted that
Plaintiff received "limited and conservative treatment" for her
symptoms and that the majority of the objective evidence showed
that Plaintiff "is stable and is progressing well with the
medication that is prescribed her."   (Id.)   He also noted that
Plaintiff's daily activities "show a level of functioning that

39

1  would not preclude the claimant from at least performing simple,

2  routine tasks with minimal contact with the public and co-

3  workers."  (Id.)  The ALJ gave clear and convincing reasons for

4  discounting Plaintiff's credibility to the extent it was

5  inconsistent with her RFC.

6      The ALJ's finding that Plaintiff's alleged symptoms were not

7  supported by objective evidence was a clear and convincing reason

8  for discounting her credibility.  (AR 67); see Carmickle, 533

9  F.3d at 1161 ("Contradiction with the medical record is a

10  sufficient basis for rejecting the claimant's subjective

11  testimony."); Lingenfelter, 504 F.3d at 1040 (in determining

12  credibility, ALJ may consider "whether the alleged symptoms are

13  consistent with the medical evidence"); Burch v. Barnhart, 400

14  F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence

15  cannot form the sole basis for discounting pain testimony, it is

16  a factor that the ALJ can consider in his credibility

17  analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir.

18  2009) (same).  As the ALJ pointed out, "the bulk of the progress

19  notes" from Plaintiff's treating doctors showed that she was

20  "stable and progressing well with the medication that is

21  prescribed her."  (AR 67; see AR 203-04, 209-14, 225, 263-64,

22  268, 269-74, 292, 294, 295, 296-98, 299-301, 302-14, 316-17.)

23  Her claims that her medication was not totally effective and

24  caused side effects that limited her ability to function (AR 23-

25  26, 188-90) also conflicted with the medical evidence showing

26  that she tolerated her medications well and had no notable side

27  effects (AR 263-68, 269-74, 296-301, 302-14; see also AR 20-24

28  (denying side effects and stating that medication helped control

1  moods)).   Moreover, Plaintiff was noted by her doctors to be

2  pleasant, polite, friendly, and able to get along well with

3  others.   (See AR 213-13, 267, 293, 335-36.)   Indeed, Plaintiff

4  told Dr. Smith that she did not attend AA meetings because she

5  was "lazy."   (AR 289, 290.)   This evidence conflicted with

6  Plaintiff's claims that she was "confrontational," too paranoid

7  to go out in public, and unable to do any kind of work activity

8  because of her mental illness.   (AR 16-25, 183-90.)   Plaintiff

9  also claimed at the hearing to have had visual hallucinations,

10  even though no evidence anywhere in the record suggests that she

11  ever complained of them before.   (AR 25; see AR 128, 212-14, 231,

12  263-68, 276, 283, 289-301, 332-36.)   The ALJ thus properly

13  discounted Plaintiff's testimony to the extent that it conflicted

14  with the objective medical evidence.

15      The ALJ was also entitled to discount Plaintiff's

16  credibility because her claims of disability conflicted with her

17  reports as to her daily activities.   See Smolen, 80 F.3d at 1284

18  (ALJ may use "ordinary techniques of credibility evaluation,"

19  such as "prior inconsistent statements concerning the symptoms,

20  and other testimony by the claimant that appears less than

21  candid"); Thomas, 278 F.3d at 958-59 (in assessing credibility,

22  ALJ may consider inconsistencies either in claimant's testimony

23  or between testimony and conduct); cf. Molina, 674 F.3d at 1113

24  ("Even where [claimant's] activities suggest some difficulty

25  functioning, they may be grounds for discrediting the claimant's

26  testimony to the extent that they contradict claims of a totally

27  debilitating impairment.").   The ALJ noted that Plaintiff's daily

28  activities "show a level of functioning that would not preclude

41

the claimant from at least performing simple, routine tasks with minimal contact with the public and co-workers." (AR 67.) Plaintiff reported that she was able to cook, do laundry, clean the house, go for frequent walks, go grocery shopping, do yard work, and socialize with friends and family. (AR 135-49, 183-90.) The record also showed that she took care not only of herself but of her mother as well.[12] (AR 23, 210, 249, 289-90, 292-93, 294-95, 332.) That Plaintiff's allegations of disabling mental illness were inconsistent with her daily activities was a valid reason for the ALJ to discount her testimony. See Molina, 674 F.3d at 1113 (ALJ properly found that plaintiff's extensive daily activities, "including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering from debilitating panic attacks").

Because the ALJ gave clear and convincing reasons for his credibility finding and those reasons were supported by substantial evidence, the Court "may not engage in second-guessing." Thomas, 278 F.3d at 959 (citation omitted). Plaintiff is not entitled to reversal on this claim.

**VI.  CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four

---

[12]    Given these activities, Plaintiff's claim that she could not lift or carry even 10 pounds (AR 187) was not credible, particularly given that she had no physical impairments other than obesity (AR 203, 211, 225).

42

1  of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered

2  AFFIRMING the decision of the Commissioner and dismissing this

3  action with prejudice.   IT IS FURTHER ORDERED that the Clerk

4  serve copies of this Order and the Judgment on counsel for both

5  parties.

6

7

8  DATED:   __July 12, 2013__        **JEAN ROSENBLUTH**

9                                    JEAN ROSENBLUTH
                                     U.S. Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  _____

26    [13]    This sentence provides: "The [district] court shall

27  have power to enter, upon the pleadings and transcript of the
    record, a judgment affirming, modifying, or reversing the

28  decision of the Commissioner of Social Security, with or without
    remanding the cause for a rehearing."