

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUL 1 2 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

RHONDA LEANNE HAMLIN,            ) Case No. CV 12-6369-JPR
                                 )
              Plaintiff,         )
                                 )
        vs.                      ) MEMORANDUM OPINION AND ORDER
                                 ) AFFIRMING THE COMMISSIONER
CAROLYN W. COLVIN,               )
Acting Commissioner of          )
Social Security,[1]              )
                                 )
              Defendant.         )
                                 )
_____ )

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed April 19, 2013, which the Court has taken

_____

[1]     On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

1

1  under submission without oral argument. For the reasons stated

2  below, the Commissioner's decision is affirmed and this action is

3  dismissed.

4  **II. BACKGROUND**

5  Plaintiff was born on May 14, 1975. (Administrative Record

6  ("AR") 106.) She has a high-school education. (AR 14.) She has

7  worked as a cashier, fast-food employee, and housecleaner. (AR

8  129.)

9  On May 19, 2009, Plaintiff filed applications for DIB and

10 SSI, alleging that she had been unable to work since April 25,

11 2008, because of mental illness. (AR 106, 113, 128.) After her

12 applications were denied, Plaintiff requested a hearing before an

13 Administrative Law Judge ("ALJ"). (AR 93-94.) A hearing was

14 held on February 2, 2011, at which Plaintiff, who was represented

15 by a nonattorney representative, testified, as did a vocational

16 expert ("VE"). (AR 11-29.) In a written decision issued

17 February 25, 2011, the ALJ found that Plaintiff was not disabled.

18 (AR 57-73.) On June 1, 2012, the Appeals Council considered

19 additional evidence from Plaintiff's treating psychiatrist but

20 denied Plaintiff's request for review. (AR 1-6.) This action

21 followed.

22 **III. STANDARD OF REVIEW**

23 Pursuant to 42 U.S.C. § 405(g), a district court may review

24 the Commissioner's decision to deny benefits. The ALJ's findings

25 and decision should be upheld if they are free of legal error and

26 supported by substantial evidence based on the record as a whole.

27 Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,

28 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746

(9th Cir. 2007).   Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.   Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).   It is more than a scintilla but less than a preponderance.   Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).   "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.   Id. at 720-21.

## IV.   THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is

3

currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.
§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not
engaged in substantial gainful activity, the second step requires
the Commissioner to determine whether the claimant has a "severe"
impairment or combination of impairments significantly limiting
her ability to do basic work activities; if not, a finding of not
disabled is made and the claim must be denied.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a
"severe" impairment or combination of impairments, the third step
requires the Commissioner to determine whether the impairment or
combination of impairments meets or equals an impairment in the
Listing of Impairments ("Listing") set forth at 20 C.F.R., Part
404, Subpart P, Appendix 1; if so, disability is conclusively
presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).  If the claimant's impairment or combination
of impairments does not meet or equal an impairment in the
Listing, the fourth step requires the Commissioner to determine
whether the claimant has sufficient residual functional capacity
("RFC")[2] to perform her past work; if so, the claimant is not
disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv),
416.920(a)(4)(iv).  The claimant has the burden of proving that
she is unable to perform past relevant work.  Drouin, 966 F.2d at
1257.  If the claimant meets that burden, a prima facie case of

---

[2]     RFC is what a claimant can do despite existing
exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545,
416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th
Cir. 1989).

1  disability is established.  Id.  If that happens or if the
2  claimant has no past relevant work, the Commissioner then bears
3  the burden of establishing that the claimant is not disabled
4  because she can perform other substantial gainful work available
5  in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
6  That determination comprises the fifth and final step in the
7  sequential analysis.  §§ 404.1520, 416.920; Lester, 81 F.3d at
8  828 n.5; Drouin, 966 F.2d at 1257.

9        B.    The ALJ's Application of the Five-Step Process

10       At step one, the ALJ found that Plaintiff had not engaged in
11  any substantial gainful activity since April 25, 2008.  (AR 62.)
12  At step two, the ALJ concluded that Plaintiff had the severe
13  impairments of impulse-control disorder, borderline intellectual
14  functioning, panic attacks, borderline personality disorder,
15  intermittent explosive disorder, psychosis, developmental
16  disability, obesity, depression, anxiety, and history of alcohol
17  and polysubstance abuse.  (Id.)  At step three, the ALJ
18  determined that Plaintiff's impairments did not meet or equal any
19  of the impairments in the Listing.  (AR 65.)  At step four, the
20  ALJ found that Plaintiff retained the RFC to perform a full range
21  of work at all exertional levels but with the nonexertional
22  limitations that she should be limited to simple, routine tasks
23  and minimal contact with the public and coworkers.  (AR 66.)
24  Based on the VE's testimony, the ALJ concluded that Plaintiff was
25  capable of performing jobs that existed in significant numbers in
26  the national economy.  (AR 67-68.)  Accordingly, the ALJ
27  determined that Plaintiff was not disabled.  (AR 68.)
28

## V.   DISCUSSION

Plaintiff alleges that the ALJ erred in (1) rejecting the opinion of one of her treating psychiatrists, Nancy Smith, and (2) finding Plaintiff's subjective symptom testimony not credible.  (J. Stip. at 3.)

### A.   The ALJ Properly Evaluated the Medical Evidence

Plaintiff contends that the ALJ failed to properly consider the opinions of treating psychiatrist Dr. Smith.  (J. Stip. at 3-8, 13-17.)  Remand is not warranted on that basis, however, because the ALJ provided legally sufficient reasons for according little weight to Dr. Smith's opinions.

#### 1.   Applicable law

Three types of physicians may offer opinions in Social Security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)."  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).  When a treating physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id.  Further, the ALJ need not accept any medical opinion that conflicts with the physician's own treatment notes or the record as a whole. See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that discrepancy between physician's notes and his assessment of limitations was "clear and convincing" reason for rejecting opinion); Connett v. Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (affirming ALJ's rejection of physician's RFC questionnaire because it was "not supported by his own notes" and "had multiple inconsistencies with all other evaluations" (alteration omitted)).

## 2.   Relevant facts

On August 17, 2006, Plaintiff visited primary-care physician Dr. Joseph Ortiz.  (AR 203.)  He examined her and noted that she had "a history of anxiety and depression" but was currently "stabilized" on Zoloft and Trazodone.[3]  (Id.)  He also noted that she had been having "anger outrages along with chronic intermittent tension headaches, and these are stable."  (Id.) She denied currently having headaches, visual symptoms, paresthesias,[4] weakness of extremities, or abrupt changes in behavior, and her mood was noted as "stable" with no "homicidality or suicidality."  (Id.)  Her vital signs and physical exam were normal.  (Id.)  Her neurological symptoms were noted as "[a]lert and oriented" with no acute deficits, and her headaches, anxiety, and depression were again noted as "stable." (Id.)

On October 3, 2006, social worker Victoria Roberts noted that Plaintiff's doctor, "Dr. A," had referred Plaintiff for

---

[3]     Trazodone is a serotonin modulator used to treat depression.  Trazodone, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a681038.html (last updated June 26, 2013).  Zoloft is a selective serotonin reuptake inhibitor used to treat depression, obsessive-compulsive disorder, panic attacks, and social anxiety disorder.  Sertraline, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last updated June 26, 2013).

[4]     Paresthesia is "a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body."  Parasthesia Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last updated May 6, 2010).  It is "usually painless and described as tingling or numbness, skin crawling, or itching." Id.

counseling and case-management services in connection with her participation in a drug diversion program and application for various government benefits, including SSI. (AR 206.) She wrote that Plaintiff's doctor described her as "developmentally delayed [and] currently experiencing [increased] 'rage[,]' [and] Zoloft is only limitedly helpful." (Id.) She noted that it appeared that Plaintiff "may need neurological eval. due to birth trauma [and] years of head injuries due to domestic violence [and] battery." (Id.)

On October 15, 2006, consulting psychiatrist Dr. Gabrielle Paladino performed a "comprehensive psychiatric evaluation" of Plaintiff. (AR 209.) She spent 40 minutes meeting with and examining Plaintiff. (AR 214.) She noted that Plaintiff complained of a history of panic attacks, but they were "getting better" over time. (AR 209.) Plaintiff described her mood as "up and down" depending on her stress level, and she complained about financial stressors. (AR 210.) Plaintiff stated that she was working as a caregiver for her mother and two other women and was also working as a housekeeper. (AR 210.) She "denied feeling helpless, useless, worthless, overwhelmed or hopeless" but "did endorse feeling frustrated about her current financial situation." (Id.) She recounted her history of drug and alcohol abuse but stated that she had not used drugs for approximately nine months and was attending a 12-step program. (Id.) When asked about her past medical history, Plaintiff "stated that she does not believe she has any serious or chronic medical problems." (AR 211.) Dr. Paladino noted that Plaintiff was alert and oriented, was a "sincere and reliable" historian, and

her memory was "intact." (AR 212.) She further noted that
Plaintiff was well groomed, her mood was "open, polite, pleasant,
and friendly," she "easily established good rapport with the
examiner," and her "affect was broad and appropriate to her
mood." (Id.) Plaintiff's speech was spontaneous, fluent, and
well modulated, and Plaintiff denied auditory and visual
hallucinations and suicidal or homicidal ideation. (Id.) There
was "no evidence of paranoid thought processes, grossly
delusional thinking, flight of ideas, tangentiality,
circumstantiality, thought blocking, word salad, grandiosity or
pressured speech." (Id.) Plaintiff also displayed "no unusual
psychomotor agitation or retardation" and "demonstrated good
humor throughout the interview." (Id.) Plaintiff's cognitive
functions were generally normal, though Plaintiff's "[i]nsight
into her condition and judgment appear to be marginal." (Id.)
Dr. Paladino diagnosed Plaintiff as having "[p]anic attacks with
agoraphobia, very mild," and a history of polysubstance abuse and
dependence, and she assessed a current Global Assessment of
Functioning ("GAF") score of 65-70 and "highest GAF all year
same."[5] (AR 212-13.)

     Dr. Paladino then assessed Plaintiff's functional
capacities. She stated that Plaintiff's panic attacks "are mild

_____

     [5]   A GAF score represents a rating of overall
psychological functioning on a scale of 0 to 100.  See Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders
[hereinafter DSM-IV], Text Revision 34 (4th ed. 2000).  A GAF
score between 60 and 70 indicates "some mild symptoms (e.g.
depressed mood and mild insomnia) OR some difficulty in social,
occupational, or school functioning . . . but generally
functioning pretty well, has some meaningful interpersonal
relationships."  Id.

and were probably triggered by methamphetamine abuse" and had "correspondingly decreased in severity" since Plaintiff had stopped using illegal drugs.  (AR 213.)  She also noted that Plaintiff's disability application "alleged problems with anger, but there was no evidence of such a problem during today's interview."  "If anything," Dr. Paladino noted, "the claimant was quite cordial and pleasant throughout today's interview."  (Id.) Dr. Paladino noted that given Plaintiff's history of working as a caregiver and her presentation during the examination, Plaintiff "would be able to appropriately relate with, interact with and deal with others"; concentrate and pay attention for two-hour increments; process "at least two- or three-step job instructions"; and "respond to simple changes in a routine work setting and . . . engage in group, goal-directed activities at work, such as following safety regulations and attendance rules." (Id.)  She concluded that Plaintiff would not be a "cause for fear or distraction" by others in the workplace and would be able to use public transportation to get to work, maintain basic standards of decency and personal hygiene, accept feedback from supervisors, and work in "close proximity to others" without "deteriorating into behavioral extremes."  (AR 213-14.)  Thus, Dr. Paladino concluded that Plaintiff was able to work, though her prognosis was "guarded" in light of Plaintiff's history of substance abuse.  (AR 214.)

On June 27, 2008, Plaintiff's primary care was transferred to Dr. Robert Guerra.  (AR 225.)  He noted upon her first visit that Plaintiff's "problems began in 2005," after she "lost her father in 2004" and was "having suddenly stress triggers with

11

public contact, easily overwhelmed and aggravated." (<u>Id.</u>)  He
also noted that Plaintiff had been prescribed a combination of
Risperdal,[6] Trazodone, and Zoloft; she had "done well with the
combination and it has stabilized a lot of the anger that she has
experienced"; and she was no longer using illegal drugs or
alcohol.  (<u>Id.</u>)  Plaintiff's physical examination was normal, and
the doctor noted that she "has had good response to her
medications" for her psychiatric issues.  (<u>Id.</u>)

On August 22, 2008, Plaintiff visited Dr. Guerra to request
a referral to a psychiatrist for medication management.  (AR
221.)  Dr. Guerra noted that Plaintiff had last been under
psychiatric care in 2007 and that she had been diagnosed with "a
mood disorder, depression, borderline intellectual functioning,
borderline personality disorder, methamphetamine use, [and]
impulse control disorder."  (<u>Id.</u>)  He noted that Plaintiff did
not feel "completely stable" with her current medication, though
she had "some positive effect" from her medications and denied
active suicidal ideations.  (<u>Id.</u>)  He referred Plaintiff to
psychiatry at her request, to follow up on treatment of "her
depression, intermittent explosive disorder and to have a
psychiatrist further refine her treatment."  (<u>Id.</u>)

On June 5, 2009, Plaintiff was evaluated by a social worker
with the Santa Barbara County Alcohol, Drug and Mental Health
Department.  (AR 229-36.)  He noted that Plaintiff complained of

---

[6]    Risperdal is an antipsychotic medication used to treat
symptoms of schizophrenia and bipolar disorder.  <u>Risperidone</u>,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a694015.html (last updated June 26, 2013).

1  auditory hallucinations telling her to kill her mother or
2  herself, though she denied any suicidal or homicidal intent.   (AR
3  231, 233.)   He noted that Plaintiff had a history of drug and
4  alcohol abuse, had suffered a head injury from domestic abuse by
5  her ex-boyfriend in 2005, and had developmental delays caused by
6  being born with her umbilical cord wrapped around her neck.   (AR
7  231.)   He noted with respect to her mental status that Plaintiff
8  was oriented and did not suffer from delusions, compulsions,
9  obsessions, or ideas of reference, but she did have auditory
10  hallucinations, a depressed and anxious mood, and a shallow
11  affect.   (AR 234.)   Plaintiff reported unspecified memory
12  problems, but her thought processes were logical and coherent,
13  her speech was normal, and her judgment and insight were fair.
14  (AR 235.)

15      On July 14, 2009, Plaintiff was evaluated by consulting
16  psychiatrist L. Leaf.   (AR 237.)   Dr. Leaf noted that Plaintiff
17  had the impairments of "mood disorder NOS" and anxiety with
18  "recurrent severe panic attacks."   (AR 241-42.)   Plaintiff was
19  noted to have mild restriction of her activities of daily living,
20  mild difficulties in maintaining social functioning, moderate
21  difficulties in maintaining concentration, persistence, or pace,
22  and no episodes of decompensation.   (AR 247.)   Dr. Leaf reviewed
23  and summarized the medical evidence and noted that Plaintiff was
24  able to clean, cook, socialize, and care for her personal needs,
25  and she also assisted her mother in all daily activities.   (AR
26  249.)   Dr. Leaf assessed that Plaintiff was able to perform
27  simple, repetitive tasks with normal supervision and would
28  "benefit from a low stress environment."   (Id.)   Dr. Leaf then

performed a mental RFC assessment, noting that Plaintiff was
moderately limited in the ability to understand, remember, and
carry out detailed instructions, maintain attention and
concentration, complete a normal workday and workweek without
interruptions from psychological symptoms or an unreasonable
number and length of rest periods, interact appropriately with
the general public, and respond appropriately to changes in the
work setting, but she was not significantly limited in any other
aspects.  (AR 251-52.)  Dr. Leaf concluded that Plaintiff was
able to understand and follow simple instructions, could perform
routine tasks, had no limitations in social interactions or
attendance, and could relate well to others and adapt to routine
changes in the work environment.  (AR 253.)

On June 5, 2009, Plaintiff visited psychiatrist Dr. Jeffrey
Davis at the county mental-health-services office.  (AR 266-68.)
Dr. Davis noted Plaintiff's history of being born with her
umbilical cord around her neck, domestic violence, and past drug
use.  (AR 266-67.)  He noted that her "chief complaint" was
hearing voices, which started in 2005 and told her to kill her
mother and herself, though she did not act on their suggestions.
(AR 266.)  He also noted that at some unspecified point in time,
Plaintiff claimed to have tried to "play chicken with a semi-
truck" but had jumped out of the way at the last minute.  (Id.)
He noted that her symptoms included depressed mood, mood swings,
insomnia, auditory hallucinations, and 60-pound weight gain.
(Id.)  He described Plaintiff's demeanor as "alert" and "in no
perceptible distress" and noted that she was dressed and groomed
appropriately.  (AR 267.)  Plaintiff spoke normally, made good

eye contact, and was cooperative and engaged.  (Id.)  She was
oriented to person, place, time, and situation, and her affect
was broad, neutral, mood-congruent, and appropriate, though her
mood was somewhat contradictorily noted as euthymic, anxious,
dysphoric, dysthymic, depressed, and manic.  (Id.)  Plaintiff
showed no signs of psychotic ideation, misperception, delusion,
or suicidal or homicidal ideation, and her impulse control,
judgment, and insight were judged to be "fair to good."  (Id.)
Plaintiff's movements and ambulation were normal.  (Id.)  Dr.
Davis noted that Plaintiff had no history of "developmental or
educational difficulties."  (Id.)  He also noted that she had
"low normal intelligence" and that it created "employment
limitations which place [her] in lowest socioeconomic pay scale,
perhaps below what she might obtain if on disability."  (Id.)  He
concluded by noting that Plaintiff was "[p]sychiatrically
stable," though she continued to have "persistent psychotic
symptoms requiring medication modification"; her current
medications were noted as "well tolerated and are having no
apparent untoward effects."  (AR 268.)  He continued her current
medications and also prescribed Abilify.[7]  (Id.)

On August 17, 2009, Plaintiff again saw Dr. Davis.  (AR 263-
65.)  He noted that she had a "[d]epressed mood," but it was
"more level - [n]either terribly happy nor sad," she had no
recent suicidal ideations, and she was "better," with "50%

_____

[7]     Abilify is an antipsychotic medication used to treat
various mental illnesses, including schizophrenia and depression.
See Aripiprazole, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a603012.html (last updated June 26,
2013).

15

improvement." (AR 263.) Plaintiff's mood swings were "gone,"
she was "sleeping well," and her auditory hallucinations were
ongoing but her "psychotic sym[p]toms [were] not as bothersome as
before." (Id.) Dr. Davis noted that Plaintiff was exercising,
had lost five pounds, and had "more energy with Abilify," and her
anxiety was "good with sertraline and trazodone; no more panic
attacks." (Id.) He noted that Plaintiff was alert, cooperative,
and in no distress, and her psychiatric symptoms were normal.
(Id.) He again concluded that Plaintiff was "[p]sychiatrically
stable," and her "persistent psychotic symptoms" were well
managed with medication. (AR 264.)

Notes from Plaintiff's visits to the county mental-health-
services office between June and September 2009 for medication
checkups and refills show that Plaintiff was "responding well" to
her medications and reported feeling "less depressed." (AR 269-
74.)

On October 12, 2009, Plaintiff visited Dr. Davis, who noted
that Plaintiff, on her current medications, reported that her
mood was "normal," denied broad fluctuations in mood, and
reported being "on a more even keel" "but sometimes if she
becomes overwhelmed, she also becomes frustrated and angry." (AR
299.) He noted that she was sleeping well and her auditory
hallucinations had come back, but an increase in her dosage of
Abilify "was helpful." (Id.) Plaintiff reported that she had
not used illegal drugs in 22 months and had not had any panic
attacks. (Id.) Plaintiff's behavior and mental status were
normal. (AR 299-300.) Dr. Davis noted that Plaintiff was
"[p]sychiatrically stable," and her symptoms were managed with

16

1    medication, which was "well tolerated." (AR 301.)

2        On October 14, 2009, consulting psychiatrist Dr. K. Loomis

3    reviewed the record and found that Plaintiff was capable of

4    performing simple, repetitive tasks. (AR 275-77.)

5        Plaintiff saw Dr. Davis again on February 12 and March 10,

6    2010, when her symptoms were again reported as stable and

7    controlled by her medications. (AR 296-98, 316-17.)

8        On April 15, 2010, Plaintiff first saw psychiatrist Dr.

9    Nancy Smith, at the county mental-health-services office; Dr.

10   Smith appears to have taken over Plaintiff's case from Dr. Davis.

11   (AR 294-95.)  Plaintiff told Dr. Smith that she had been "hearing

12   voices and Dr. Davis got me regulated on some medication and I

13   don't hear them any more." (AR 294.)  She described her mental

14   state as "I have my ups and downs, today I am OK." (Id.)  Dr.

15   Smith noted that Plaintiff "takes care of" her mother and had

16   "filed for social security." (Id.)  She also noted that

17   Plaintiff "stopped working due to not being able to work and deal

18   with the voices," but she "feels less depressed" after Dr. Davis

19   changed her medications. (Id.)  Plaintiff admitted to drinking

20   "2-3 beers daily this past month" because she was "depressed and

21   lonely." (Id.)  When asked about work, Plaintiff responded that

22   work "stressed [her] out," she was "unable to think of what she

23   can do for work," and she was "waiting for a court date for

24   disability." (AR 295.)  Dr. Smith noted that in school,

25   Plaintiff was "in special ed with a learning disability . . .

26   with the slow learners." (Id.)

27       Dr. Smith examined Plaintiff and found that she was

28   "oriented in all spheres," knew who the current president was,

"recalled 2/3 words at 5 minutes," and "was able to subtract serial threes with difficulty." (Id.) Plaintiff stated that she had last heard voices "a year ago," up until Dr. Davis put her on Abilify. (Id.) Dr. Smith then noted that Plaintiff "is a very low functioning individual and would never be able to compete on the open labor market." (Id.) She diagnosed Plaintiff with psychosis not otherwise specified, mood disorder not otherwise specified, alcohol abuse, a "mild developmental disability," and obesity and noted that it was "difficult for [Plaintiff] to care for her obese mother," who was in a wheelchair. (Id.) She assessed a GAF score of 40.[8] (Id.) Her prognosis was "[g]uarded for marked improvement"; she also noted that she "believe[d] [Plaintiff] needs SSI" because "[s]he is better now than before, but I do not believe that she could hold down a job due to her slowness and probable brain injury from the assault (bike thrown at her)." (Id.)

Plaintiff saw Dr. Smith again on June 29, 2010. (AR 292.) Dr. Smith noted that Plaintiff "is doing better than 2 months ago since I last saw her" and had started attending Alcoholics Anonymous meetings. (Id.) She noted that Plaintiff's concentration was better on Abilify but "still is not what it was before 2005." (Id.) Plaintiff was still taking care of her mother and reported "making a very small amount of money from"

---

[8]   A GAF score of 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work[.])." See DSM-IV, supra note 5, at Text Revision 34.

18

1  doing so.   (AR 292-93.)   Plaintiff's affect was noted as

2  "cheerful," and she stated that she "no longer hears voices on

3  the Abilify."   (AR 293.)   Dr. Smith described Plaintiff as having

4  "a very sweet and innocent way about her."   (Id.)   In her

5  diagnosis, she noted that Plaintiff "is a very low functioning

6  individual and would never be able to compete on the open labor

7  market."   (Id.)

8      On October 5, 2010, Dr. Smith filled out a Mental Residual

9  Functional Capacity Questionnaire.   (AR 282-87.)   She stated that

10 she was seeing Plaintiff every three months for one hour at a

11 time.   (AR 282.)   She noted diagnoses of depression and psychosis

12 not otherwise specified, developmental disability, obesity, and a

13 current GAF of 50.[9]   (Id.)   She stated that Plaintiff heard

14 voices, which "decreased a little w/ Abilify - still hears some

15 voices, voices developed (onset) after beaten by [boyfriend]."

16 (Id.)   She stated that Plaintiff was "oriented in all spheres"

17 and her prognosis was "guarded."   (AR 283.)   She checked boxes

18 indicating that Plaintiff had the symptoms of "anhedonia or

19 pervasive loss of interest in almost all activities," "appetite

20 disturbance with weight change," "decreased energy," "thoughts of

21 suicide," "blunt" and "inappropriate" affect, "feelings of guilt

22 or worthlessness," "impairment in impulse control," "poverty of

23 content of speech," "generalized persistent anxiety," "mood

24 disturbance," "mild" difficulty thinking or concentrating,

25

26      [9]   A GAF score of 50 indicates "serious symptoms (e.g.,
   suicidal ideation, severe obsessional rituals, frequent
27 shoplifting) OR any serious impairment in social, occupational,
   or school functioning (e.g., no friends, unable to keep a job)."
28 See DSM-IV, supra note 5, at Text Revision 34.

"recurrent and intrusive recollections of a traumatic experience,
which are a source of marked distress," "mild" retardation,
pathological passivity, persistent disturbances of mood, "mild[]"
seclusiveness, "mild" isolation, hallucinations or delusions with
"some voices," and "very mild" memory impairment.  (Id.)  In the
category, "Loss of intellectual ability of 15 IQ points or more,"
she wrote, "it appears that way?"  (Id.)

Dr. Smith indicated that Plaintiff's "psychological or
behavioral abnormalities" were associated with a "dysfunction of
the brain."  (AR 284.)  She indicated that Plaintiff's ability to
remember work-like procedures, understand and remember very short
and simple instructions, ask simple questions or request
assistance, accept instructions and respond appropriately to
criticism from supervisors, and get along with coworkers or peers
without unduly distracting them or exhibiting behavioral extremes
was "limited but satisfactory"; Plaintiff's ability to carry out
very short and simple instructions, maintain attention for two-
hour segments, respond appropriately to changes in a routine work
setting, deal with normal work stress, and be aware of normal
hazards and take appropriate precautions was "seriously limited,
but not precluded"; Plaintiff's ability to maintain regular
attendance and be punctual within customary, usually strict
tolerances, sustain an ordinary routine without special
supervision, work in coordination with or proximity to others
without being unduly distracted, make simple work-related
decisions, and complete a normal workday and workweek without
interruptions from psychologically based symptoms was "unable to
meet competitive standards"; and Plaintiff had "no useful ability

to function" with respect to being able to perform at a
consistent pace without an unreasonable number and length of rest
periods.  (Id.)  She stated that Plaintiff would "become
frustrated and angry" if she were pressured at work, had "trouble
sticking to chores at times," "believes she makes wrong decisions
a lot of the time," and had "poor" self-esteem.  (AR 285.)  She
indicated that Plaintiff was "unable to meet competitive
standards" to understand, remember, and carry out detailed
instructions, set realistic goals, or make plans independently of
others, and she had "no useful ability to function" in dealing
with the stress of semiskilled or skilled work.  (Id.)  She noted
that Plaintiff had "unlimited or very good" ability to adhere to
basic standards of neatness and cleanliness, "limited but
satisfactory" ability to maintain socially appropriate behavior,
"seriously limited but not precluded" ability to interact
appropriately with the general public, "unable to meet
competitive standards" in her ability to travel to an unfamiliar
place, and "no useful ability to function" in her ability to use
public transportation because she "dislikes being around a lot of
people."  (Id.)  She noted that Plaintiff "once tried to play
chicken w/ a truck + jumped in front of it."  (Id.)  She
indicated that Plaintiff had "a low IQ or reduced intellectual
functioning," but when asked to refer to specific test results,
she wrote "none done here."  (AR 286.)  She indicated that
Plaintiff's impairments would cause her to be absent from work
more than four days a month.  (Id.)  She noted that Plaintiff
would have difficulty working on a sustained basis because she
was "irritable, stressed out and overwhelmed" and "could not do

more than 1 task."  (Id.)

On October 10, 2010, Plaintiff again saw Dr. Smith.  (AR
289.)  Dr. Smith noted that Plaintiff had stopped attending AA
meetings "because I think I have a lazy streak in me," but she
was not drinking.  (Id.)  She stated that she was hearing voices
"off and on," but they were not as strong as they used to be.
(Id.)  Plaintiff was "overwhelmed by having to do everything for
her mother."  (Id.)  Plaintiff reported that she stopped working
in 2005, after her ex-boyfriend hit her in the head with a
bicycle frame, "due to not being able to work and deal with the
voices."  (AR 289-90.)  She stated that she was "waiting for a
court date for disability."  (AR 290.)  Dr. Smith noted that
Plaintiff "laughs easily, but at times it seems a little
inappropriate," "complains of chronic low energy 'lazy and
irritable,'" had considered suicide "in the recent past" but had
"no active [suicidal ideation]," had auditory hallucinations
telling her to hurt herself and her mother but was "ignoring the
voices," knew the name of the president and governor but "like
most people, [s]he could not recall the name of the vice
president," could recall "3/3 words at 10 minutes," and
"believe[d] it [was] her living situation" with her mother "that
has affected her mood."  (Id.)  Dr. Smith helped Plaintiff fill
out an SSI form and noted that Plaintiff spent a "[l]ong time"
filling out the form; she also noted that she "believe[d]
[Plaintiff] needs SSI and with that could perhaps find a
protected part time job" and that "[f]illing out the SSI form
brought out how really disabled she is."  (Id.)

Notes from Plaintiff's visits to the county mental-health-

1 | services office between April and September 2010 for medication
2 | checkups and refills show that Plaintiff was "responding well" to
3 | her medications and "denie[d] most [symptoms] of depression or
4 | anxiety at present."   (AR 302-14.)

5 |    On January 27, 2011, Plaintiff again visited Dr. Smith.   She
6 | discussed having "head pain . . . like my brain hurts all the
7 | time" and said she was "still hear[ing] some voices."   (AR 332.)
8 | Plaintiff discussed feeling anxious about the status of her SSI
9 | application and reported that taking care of her mother was
10 | "stressful."   (Id.)   Dr. Smith noted that Plaintiff "relates in a
11 | child-like fashion," "has a difficult time processing
12 | information," and "is not suicidal" but still heard voices.   (AR
13 | 333.)

14 |    On March 21, 2011, one month after the ALJ issued his
15 | written decision, Plaintiff visited Dr. Smith.   (AR 335.)   She
16 | discussed being "upset about having her disability overturned."
17 | (Id.)   Dr. Smith made the following notations:

18 |        It appears that the term "psychiatrically stable" is
19 |        really   used   against   her.    Once   [sic]   can   be
20 |        "psychiatrically stable" and still not able to work.[]
21 |        It  basicaly  [sic]  means  that  she  is  stable  on  her
22 |        medications and not likely to get significantly better
23 |        and her functioning is such that she does not require
24 |        hospitalization.      Interestingly,  she  was  apparently
25 |        denied Social Security even when she was hearing voices.
26 |        The vocational worker stated she could wash dishes.   The
27 |        judge opined that she could work at limited simple tasks
28 |        with minimal contact with the public or coworkers.   My

sense is that this is only a step a way [sic] from a
sheltered workshop.  I believe her mental slowness would
prevent her from getting hired on the open labor market.

. . .

She is oriented in all spheres.  She is able to only
do simple arithmetic on her fingers or counting out loud
and is not able to subtract serial 7's.  By counting out
loud, she was able to subtract 20-3.  Today she admits to
hearing voices off and on, but they are not that
bothersome.    However, to state an opinion, I do not
believe that this is what makes her unable to compete on
the   open   labor   market.     It   is   more   her   limited
intelligence.   She is oriented in all spheres.    She
presents in a child-like fashion.

The thought processes are consistently slowed down
and concrete and this is stable.  She is living with her
mother who pays the rent.  She did recall 3/3 words at 5
minutes.  Her overall affect is pleasant.

I continue to believe that Rhonda is a very low
functioning individual and would never be able to truly
compete   on   the   open   labor   market.     She   is   ALSO
PSYCHIATRICALLY STABLE ie, she is NOT GOING TO CHANGE or
improve.   I believe she needs SSI and with that could
perhaps find a protected part time job.   As I noted
before, it was sitting with this woman for two hours
filling out the form that the level of her disability
became apparent.   I am accused of not being objective.
However, I do not see anywhere else where serial 7's were

24

1    even attempted.   I do not believe that she could
2    negotiate rent.  Her thought processes are slowed down.
3    Would I hire her to clean for me?  Absolutely not.  Her
4    thinking is too slowed down.  I could easily find a more
5    competent laborer.  Could she work in a more sheltered
6    workshop where she is helped and supported?  Yes, but
7    does that mean she is not disabled?  I do not have the
8    answer for that.  That is for the judge to determine.  I
9    would note that GAF scores are subjective and the
10   difference between 40 and 50 is not that significant.
11   What is significant is her mental slowness and
12   difficulties with anthing [sic] beyond simple arithmetic.
13   She has wound up living on the street before.  Without
14   the support of her mother, this could occur again.  I
15   question whether she could accomplish all that is
16   necessary to find work and shelter in particular on her
17   own.  (She could probably obtain free food at churches.)
18   Once again, this really can only be a subjective
19   judgment.  In my case it is based on many years of
20   treating mentally ill people and seeing how they manage
21   (or don't manage) without support.

22   (AR 335-36.)

23        3.   Analysis

24        The ALJ found that Plaintiff could perform a full range of
25   work at all exertional levels, with the nonexertional limitations
26   that she should be limited to "simple, routine tasks with minimal
27   contact with public and co-workers."  (AR 66.)  Leading up to
28   that finding, the ALJ evaluated Dr. Smith's opinions as follows:

1  Progress notes from [the county mental-health-
2  services department] from September 2009 to November 2010
3  encompass the continuing assessments from Dr. Jeffrey[10]
4  and include more recent assessments from Dr. Nancy Smith.
5  Dr. Jeffrey's [sic] continues to rate the claimant as
6  being "psychiatrically stable" and GAF's of 50 on October
7  2009 and February 2010, respectively. Also, claimant
8  reported on April 15, 2010 that she last heard voices a
9  year ago and on June 28, 2010, that Dr. Davis got me
10  regulated on some medication and I don't hear voices
11  anymore.  Follow up progress notes involving medication
12  management from September 2009 to January 2010 and from
13  April 2010 to November 2010 repeatedly report that the
14  claimant is responding well to the medication regimen and
15  has no suicidal ideation.

16  Dr. Nancy Smith, however, rated the claimant a GAF
17  of 40 on June 28, 2010 and opined that the claimant could
18  not hold down a job due to her slowness and probably
19  [sic] brain injury from the assault. On October 5, 2010,
20  Dr. Smith rated the claimant a GAF of 40 and opined that
21  the claimant is low functioning and would never be able
22  to compete on the open labor market. Similarly, on
23  January 27, 2011, Dr. Smith again rated the claimant a
24  GAF of 40 and would be unable to work. The undersigned
25  affords these opinions very little weight as they are not
26  based upon objective evidence and they are inconsistent

28  [10]   The ALJ appears to have referred to Dr. Jeffrey Davis
by his first name as well as his last.

26

with the numerous progress notes that indicate the claimant is "psychiatrically stable" and is responding well to her medication regimen as detailed above.

Lastly, Dr. Smith completed a "Mental Residual Functional Capacity Questionnaire" form on October 5, 2010. Dr. Smith noted the following diagnoses: depression, nos; psychosis, nos; developmental disability; obesity; and, a GAF of 50. Dr. Smith opined a very limited mental residual functional capacity for the claimant. Dr. Smith rated the claimant as either seriously limited, but not precluded, unable to meet competitive standards or no useful ability to function in 11 out of 16 categories of mental abilities needed to do unskilled work. The undersigned affords this opinion very little weight as it is not based upon objective evidence and it is inconsistent with the numerous progress notes that indicate the claimant is "psychiatrically stable" and is responding well to her medication regimen as detailed above. Furthermore, this medical source statement boarders [sic] on advocacy and appears to be based upon the subjective complaints of the claimant only.

(AR 64 (citations omitted).)

As an initial matter, the ALJ's RFC finding limiting Plaintiff to simple, routine tasks with minimal contact with the public and coworkers appears to accommodate many of Dr. Smith's concerns. For example, in her Mental RFC Questionnaire, Dr. Smith noted that Plaintiff had a "limited but satisfactory"

ability to understand and remember worklike procedures and very
short and simple instructions, ask simple questions or request
assistance, accept instructions and respond appropriately to
criticism from supervisors, and get along with coworkers or peers
without unduly distracting them or exhibiting behavioral
extremes, and she was "not precluded" from carrying out very
short and simple instructions and maintaining attention for two-
hour segments (AR 284); these limitations presumably would be
accommodated to some extent by the ALJ's RFC limitation to
simple, repetitive tasks and minimal contact with coworkers and
the public (AR 66).   Indeed, the ALJ appears to have given
Plaintiff great benefit of the doubt in limiting her to minimal
contact with coworkers and the public, as nearly all of the
medical evidence in the record, including Dr. Smith's notes,
shows that Plaintiff was pleasant, polite, friendly, and seemed
to get along well with others.   (See AR 211-13, 267, 293, 335-
36.)   In June 2010, Dr. Smith even described Plaintiff as
"cheerful."   (AR 293.)

        To the extent the ALJ rejected Dr. Smith's opinions, he
provided specific and legitimate reasons, supported by
substantial evidence, for doing so.   The ALJ correctly noted that
Dr. Smith's opinions conflicted with the "numerous progress
notes" in the record, including those from Plaintiff's other
treating psychiatrists, Dr. Davis and Dr. Ortiz, and those from
Dr. Smith herself, indicating that Plaintiff's symptoms were
stable and she was responding well to her medications.   (AR 64;
see AR 203-04, 209-14, 225, 263-64, 268, 269-74, 292, 294, 295,
296-98, 299-301, 302-14, 316-17); see Bayliss, 427 F.3d at 1216;

1  Connett, 340 F.3d at 874-75; see also 20 C.F.R.

2  §§ 404.1529(c)(3)(iv) (ALJ may consider effectiveness of

3  medication in evaluating severity and limiting effects of

4  impairment), 416.929(c)(3)(iv) (same); Warre v. Comm'r of Soc.

5  Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments

6  that can be controlled effectively with medication are not

7  disabling for the purpose of determining eligibility for [Social

8  Security] benefits."). Although Dr. Smith diagnosed Plaintiff

9  with a GAF score of 40 (AR 295), other doctors diagnosed her with

10  GAF scores of between 50 and 70 (AR 212-13, 282), and Dr. Smith

11  herself admitted that a GAF assessment was "subjective" and a

12  difference of 10 points was "not that significant" (AR 336).  In

13  any event, GAF scores "[do] not have a direct correlation to the

14  severity requirements in the Social Security Administration's

15  mental disorders listings," and an ALJ may properly disregard a

16  low GAF score if other substantial evidence supports a finding

17  that the claimant was not disabled. See Doney v. Astrue, 485 F.

18  App'x 163, 165 (9th Cir. 2012) (alterations and citations

19  omitted).

20       The ALJ also permissibly rejected Dr. Smith's opinions that

21  Plaintiff would "never be able to compete on the open labor

22  market" and "needs SSI" because they were opinions on Plaintiff's

23  ultimate disability status, which the ALJ was not obligated to

24  accept.  (AR 64); see 20 C.F.R. §§ 404.1527(d)(1) ("A statement

25  by a medical source that you are 'disabled' or 'unable to work'

26  does not mean that we will determine that you are disabled."),

27  416.927(d)(1) (same); SSR 96-5p, 1996 WL 374183, at *5

28  (treating-source opinions that a person is disabled or unable to

work "can never be entitled to controlling weight or given special significance"); see also McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity.").

The ALJ was also permitted to discount Dr. Smith's limited-RFC findings and disability opinions because they were inconsistent with her own treatment notes. (AR 64); see Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports); Bayliss, 427 F.3d at 1216; Connett, 340 F.3d at 874-75. As the ALJ noted (AR 64), Dr. Smith's treatment notes stated that Plaintiff was doing "better" and responding well to her medication, and her auditory hallucinations had improved with medication. (See, e.g., AR 289-95, 332-33.) Such consistently normal or mild findings fail to support Dr. Smith's opinion that Plaintiff was so significantly disabled by her mental impairments that she was unable to, for example, maintain concentration, perform repetitive tasks, interact with coworkers, or complete a normal workweek without decompensating. (See AR 282-87.) Dr. Smith admitted that Plaintiff's auditory hallucinations were "not that bothersome" and were not the reason she felt Plaintiff was unable to work. (AR 335.) Instead, she stated that it was Plaintiff's "limited intelligence" that prevented her from working, even though she had earlier noted that no test results supported her findings that Plaintiff had a low IQ or reduced intellectual

functioning.   (AR 283, 286.)   Although Dr. Smith, in response to
the ALJ's opinion, stated that "psychiatrically stable" meant
only that Plaintiff's condition was unlikely to change (AR 335-
36), the medical evidence showed that she was in fact stable and
her symptoms were well controlled with medication.   The ALJ was
therefore entitled to reject Dr. Smith's RFC finding.   See Payne
v. Astrue, No. 3:11-cv-05320-BHS-KLS, 2011 WL 8878916, at *7
(W.D. Wash. Dec. 19, 2011) (finding that ALJ properly rejected
treating psychiatrist's opinion that plaintiff was severely
depressed because plaintiff "was found to be psychiatrically
stable later that month," noting that while doctor's statement
that plaintiff was "'psychiatrically stable' without any further
comment[] does not necessarily show [she] is without significant
functional limitations, but rather may merely indicate the
condition was unchanging at the time," doctor also noted at the
same time that "plaintiff was 'doing well on' her medication,"
"thus show[ing] that not only was plaintiff considered to be
doing well, but she was stable at that level"), accepted by 2012
WL 122867 (W.D. Wash. Jan. 17, 2012).   Moreover, the ALJ was
entitled to reject Dr. Smith's opinions to the extent they were
premised on Plaintiff's subjective complaints (AR 66), which, as
explained in section V(B) below, he properly rejected.   See
Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when
ALJ properly discounted claimant's credibility, he was "free to
disregard" doctor's opinion that was premised on claimant's
subjective complaints); Morgan v. Comm'r of Soc. Sec. Admin., 169
F.3d 595, 602 (9th Cir. 1999) (when physician's opinion of
disability premised "to a large extent" upon claimant's own

accounts of symptoms, limitations may be disregarded if
complaints have been "properly discounted").

The ALJ was also entitled to rely on the opinions of
consulting examiner Dr. Paladino and state-agency psychiatrists
Dr. Leaf and Dr. Loomis to reject Dr. Smith's opinions.  (AR 63,
67.)  As the ALJ noted, Drs. Paladino's and Leaf's opinions were
consistent with the objective evidence, including the opinions
and treatment notes of Plaintiff's other treating psychiatrist,
Dr. Davis, as well as with each other.  (AR 63-64); see Thomas,
278 F.3d at 957 ("The opinions of non-treating or non-examining
physicians may also serve as substantial evidence when the
opinions are consistent with independent clinical findings or
other evidence in the record."); see also 20 C.F.R. §§
404.1527(c)(4) (ALJ will generally give more weight to opinions
that are "more consistent . . . with the record as a whole"),
416.927(c)(4) (same).  For example, Dr. Paladino's findings that
Plaintiff was polite, pleasant, and friendly, her concentration
and attention were acceptable for two-hour increments, and she
would be able to process simple job instructions and respond to
simple changes in a routine work setting (AR 209-14) were
consistent with Drs. Davis's and Smith's findings in the
narrative reports that Plaintiff had a polite and friendly
demeanor, her symptoms were controlled with medication, and she
could perform simple tasks (see, e.g., AR 263-64, 268, 269-74,
292, 294, 295, 296-98, 299-301, 302-14, 316-17).  Dr. Leaf
similarly found that Plaintiff had moderate difficulties in
maintaining concentration, persistence, and pace; mild
restriction of activities of daily living and maintaining social

1  functioning; and no episodes of decompensation of an extended
2  duration.   (AR 247.)   And Drs. Paladino, Loomis, and Leaf
3  reviewed Plaintiff's full medical records before rendering their
4  opinions, which also supports the ALJ's finding that their
5  opinions were entitled to more weight.   (AR 214, 249); see 20
6  C.F.R. §§ 404.1527(c)(6) (extent to which doctor is "familiar
7  with the other information in [claimant's] case record" is
8  relevant factor in determining weight given to opinion),
9  416.927(c)(6) (same).   Dr. Smith, on the other hand, had been
10 treating Plaintiff for only six months and had apparently seen
11 her only a handful of times at the time she filled out the RFC
12 assessment, in October 2010, and there is no indication in the
13 record that Dr. Smith reviewed Plaintiff's full medical record
14 before rendering her opinion.   (See AR 282-87, 289, 292, 294.)
15 Although Dr. Paladino examined Plaintiff in October 2006, before
16 her alleged onset date of April 25, 2008, the medical evidence
17 shows that Plaintiff's condition did not change significantly
18 between 2006 and 2008.   Plaintiff reported that her problems
19 began in 2005, when she was abused by her ex-boyfriend, attempted
20 suicide by walking in front of a truck, and began hearing voices
21 (see AR 20-21, 187, 225, 231, 266, 289-90, 292); from 2006 on,
22 her doctors consistently reported that she was doing better on
23 medication, and she frequently denied hearing voices or having
24 any other symptoms of depression or anxiety (AR 263-64, 268, 269-
25 74, 292, 294, 295, 296-98, 299-301, 302-14, 316-17).   The ALJ's
26 reliance on Drs. Paladino's, Loomis's, and Leaf's opinions was
27 therefore proper.
28        Plaintiff also challenges the ALJ's rejection of Dr. Smith's

opinion on the ground that it "[borders] on advocacy." (AR 64; J. Stip. at 7-8.) An ALJ may not reject a treating physician's opinion based on the assumption that a treating physician has a natural tendency to advocate for her patients but may do so if there is evidence that the physician is in fact acting as an advocate. See Lester, 81 F.3d at 832 ("The [Commissioner] may not assume that doctors routinely lie in order to help their patients collect disability benefits" but "may introduce evidence of actual improprieties . . . ."); Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (holding that ALJ properly determined treating physician's opinions "were entitled to less weight" because evidence showed that physician "had agreed to become an advocate and assist in presenting a meaningful petition for Social Security benefits"); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (ALJ properly discounted treating physician's report obtained solely for purposes of administrative hearing); Buckner-Larkin v. Astrue, 450 F. App'x 626, 627 (9th Cir. 2011) (ALJ properly discounted treating physician's opinion on ground that he "appeared to be more of an advocate than an objective examiner" when finding was "supported by the record"). Here, the ALJ's finding that Dr. Smith acted as an advocate was supported by the record, and thus it was proper. As the ALJ noted, Dr. Smith's dramatically limited RFC finding was inconsistent with the medical evidence, including her own treatment notes, suggesting that it was not objective. (AR 64.) Dr. Smith repeatedly noted the status of Plaintiff's disability application, which she had helped Plaintiff fill out (AR 290), and often stated that she believed Plaintiff "needs SSI," which

34

1   suggested an intent to advocate.  (See AR 290-95, 332-33.)

2   Indeed, after the ALJ issued his written decision, Dr. Smith

3   wrote another report specifically disputing the ALJ's conclusions

4   and reiterating her belief that Plaintiff should be awarded SSI

5   benefits.  (AR 335-36.)  The ALJ's rejection of Dr. Smith's

6   opinion because it "[bordered] on advocacy" was proper.  Matney,

7   981 F.2d at 1020; see also Bagoyan Sulakhyan v. Astrue, 456 F.

8   App'x 679, 682 (9th Cir. 2011) (ALJ properly rejected physician's

9   reports that "contained an advocate's tone rather than that of a

10  treating physician").

11      Plaintiff is not entitled to remand on this ground.

12      B.   The ALJ Properly Assessed Plaintiff's Credibility

13      Plaintiff argues that the ALJ failed to articulate clear and

14  convincing reasons for rejecting Plaintiff's subjective

15  testimony.  (J. Stip. at 17-19, 22-24.)  Reversal is not

16  warranted on this basis.

17      An ALJ's assessment of pain severity and claimant

18  credibility is entitled to "great weight."  See Weetman v.

19  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

20  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

21  believe every allegation of disabling pain, or else disability

22  benefits would be available for the asking, a result plainly

23  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

24  F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and

25  citation omitted).  In evaluating a claimant's subjective symptom

26  testimony, the ALJ engages in a two-step analysis.  See

27  Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must

28  determine whether the claimant has presented objective medical

35

evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

In two function reports dated May 30, 2009, Plaintiff stated that her daily activities consisted of taking her medications, cleaning up the apartment she shared with her mother, and going for walks.[11]  (AR 135, 144.)  She also cooked meals for 30 to 45 minutes a day on a daily basis and fed and walked her dog.  (AR 136-37, 144-45.)  She spent approximately three to four hours cooking, cleaning, and doing laundry each day and did not need any help.  (AR 137, 146.)  She also did yard work and shopped for food for about one hour once a month.  (AR 138, 145.)  She stated

---

[11]    The first form Plaintiff filled out is a Third Party Function Report form, but Plaintiff filled it out herself.  (See AR 135.)

that she went outside "all the time" and was able to go out
alone. (AR 138, 146.) She stated that she was not able to
handle money in any way because she did not have a job or bank
account. (Id.) She listed "hook and latch" as a hobby but noted
that she "can't read very good" and did not socialize often
except to attend mental-health therapy. (AR 139-40, 147-48.)
She stated that she had difficulty with talking, hearing, memory,
completing tasks, concentration, understanding, and following
instructions; she could not follow written instructions "to [sic]
good"; and she "ha[d] to be reminded" to follow spoken
instructions. (AR 140, 148-49.) She stated that she
"respect[ed]" authority figures but did not handle stress and
changes in routine "to will [sic]." (AR 141, 149.)

On September 27, 2010, Plaintiff responded to a series of
written questions regarding her ability to work. (AR 183-90.)
She stated that she stopped working in "2006-2007" because she
was "unable to mentally handle [her] position." (AR 184.) She
had not looked for other work since then but had attended mental-
health counseling. (Id.) She lived with her mother and a
roommate "and [could] function daily"; her daily activities
included riding a bicycle, walking, doing crafts, and crocheting.
(Id.) She socialized with her mother, a friend, a cousin, and
other family members. (Id.) She stated that since she filed her
disability claim, her condition had changed in the following
ways: "no concentration, suicidal tendencies, hallucination,
hyperactive." (AR 185.) She stated that she attended counseling
and was prescribed medications to address her symptoms. (Id.)
She also stated that she suffered from chronic headaches but had

never seen a doctor for them, instead treating them with over-the-counter medication.  (AR 186.)  She stated that she could never lift, carry, or pull even 10 pounds, could stand or walk for less than two hours in an eight-hour day, could not sit without alternating positions, and was limited in her ability to push and pull in both her upper and lower body.  (AR 187.)  Plaintiff stated that she was "always fatigued [and] irritable" and suffered from panic attacks and anxiety caused by stress.  (AR 188.)  She stated that her medication "limits ability to function."  (Id.)  She preferred to walk rather than use public transportation because of "paranoia," did not interact well with supervisors and coworkers, and was "confrontational" in dealing with the public.  (AR 189-90.)  She stated that she was not able to recall or comprehend technical or complex job instructions, could not concentrate for any extended time, and could not deal with daily pressures or "money issues."  (AR 190.)

At the February 2, 2011 hearing before the ALJ, Plaintiff testified that she suffered from depression and had attempted suicide once in the past two or three years but was not hospitalized and did not go to an ER.  (AR 16.)  She stated that she liked "to be with others" and was close to trusted family and friends.  (Id.)  She stated that she heard voices telling her to kill or hurt somebody and had panic attacks caused by stress.  (AR 17.)  She had not done drugs since 2006 and had not consumed alcohol since 2006 except for one "binge" four months before the hearing.  (AR 17-18.)  She lived with her mother and during the day would get up and go outside for a cigarette, drink coffee, walk her dog, and lie down in the afternoon because of chronic

headaches.   (AR 18.)   She did not take any medicine for the
headaches.   (Id.)   She watched TV and would read "every once in a
while," helped her mom clean the house, cooked "a little bit,"
did not "really" do any socializing, and could go "uptown" to do
grocery shopping by herself.   (AR 19.)

Plaintiff testified that her problems began in 2005, when
she was beaten by her ex-boyfriend and then attempted suicide by
walking in front of a truck.   (AR 20-21.)   She began hearing
voices after that.   (AR 20.)   She then began taking medications,
from which she had no side effects and which helped with her
hallucinations and "control[led] [her] moods."   (AR 20-24.)   She
stated that she had problems concentrating and remembering things
and would have panic attacks when stressed.   (AR 23-25.)   She
also claimed, apparently for the first time, to be having visual
hallucinations.   (AR 25.)   She last worked in 2006, "doing in-
home health services" for her mother and another lady.   (AR 23.)
She stated that being around people did not affect her panic
attacks or hallucinations.   (AR 25.)

The ALJ found that Plaintiff's impairments "could reasonably
be expected to cause the alleged symptoms," but her "statements
concerning the intensity, persistence and limiting effects of
these symptoms are not credible to the extent they are
inconsistent with" Plaintiff's RFC.   (AR 67.)   He noted that
Plaintiff received "limited and conservative treatment" for her
symptoms and that the majority of the objective evidence showed
that Plaintiff "is stable and is progressing well with the
medication that is prescribed her."   (Id.)   He also noted that
Plaintiff's daily activities "show a level of functioning that

39

1 would not preclude the claimant from at least performing simple,
2 routine tasks with minimal contact with the public and co-
3 workers." (<u>Id.</u>) The ALJ gave clear and convincing reasons for
4 discounting Plaintiff's credibility to the extent it was
5 inconsistent with her RFC.

6      The ALJ's finding that Plaintiff's alleged symptoms were not
7 supported by objective evidence was a clear and convincing reason
8 for discounting her credibility. (AR 67); <u>see</u> <u>Carmickle</u>, 533
9 F.3d at 1161 ("Contradiction with the medical record is a
10 sufficient basis for rejecting the claimant's subjective
11 testimony."); <u>Lingenfelter</u>, 504 F.3d at 1040 (in determining
12 credibility, ALJ may consider "whether the alleged symptoms are
13 consistent with the medical evidence"); <u>Burch v. Barnhart</u>, 400
14 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence
15 cannot form the sole basis for discounting pain testimony, it is
16 a factor that the ALJ can consider in his credibility
17 analysis."); <u>Kennelly v. Astrue</u>, 313 F. App'x 977, 979 (9th Cir.
18 2009) (same). As the ALJ pointed out, "the bulk of the progress
19 notes" from Plaintiff's treating doctors showed that she was
20 "stable and progressing well with the medication that is
21 prescribed her." (AR 67; <u>see</u> AR 203-04, 209-14, 225, 263-64,
22 268, 269-74, 292, 294, 295, 296-98, 299-301, 302-14, 316-17.)
23 Her claims that her medication was not totally effective and
24 caused side effects that limited her ability to function (AR 23-
25 26, 188-90) also conflicted with the medical evidence showing
26 that she tolerated her medications well and had no notable side
27 effects (AR 263-68, 269-74, 296-301, 302-14; <u>see also</u> AR 20-24
28 (denying side effects and stating that medication helped control

1  moods)).   Moreover, Plaintiff was noted by her doctors to be
2  pleasant, polite, friendly, and able to get along well with
3  others.   (See AR 213-13, 267, 293, 335-36.)   Indeed, Plaintiff
4  told Dr. Smith that she did not attend AA meetings because she
5  was "lazy."   (AR 289, 290.)   This evidence conflicted with
6  Plaintiff's claims that she was "confrontational," too paranoid
7  to go out in public, and unable to do any kind of work activity
8  because of her mental illness.   (AR 16-25, 183-90.)   Plaintiff
9  also claimed at the hearing to have had visual hallucinations,
10 even though no evidence anywhere in the record suggests that she
11 ever complained of them before.   (AR 25; see AR 128, 212-14, 231,
12 263-68, 276, 283, 289-301, 332-36.)   The ALJ thus properly
13 discounted Plaintiff's testimony to the extent that it conflicted
14 with the objective medical evidence.

15     The ALJ was also entitled to discount Plaintiff's
16 credibility because her claims of disability conflicted with her
17 reports as to her daily activities.   See Smolen, 80 F.3d at 1284
18 (ALJ may use "ordinary techniques of credibility evaluation,"
19 such as "prior inconsistent statements concerning the symptoms,
20 and other testimony by the claimant that appears less than
21 candid"); Thomas, 278 F.3d at 958-59 (in assessing credibility,
22 ALJ may consider inconsistencies either in claimant's testimony
23 or between testimony and conduct); cf. Molina, 674 F.3d at 1113
24 ("Even where [claimant's] activities suggest some difficulty
25 functioning, they may be grounds for discrediting the claimant's
26 testimony to the extent that they contradict claims of a totally
27 debilitating impairment.").   The ALJ noted that Plaintiff's daily
28 activities "show a level of functioning that would not preclude

41

the claimant from at least performing simple, routine tasks with minimal contact with the public and co-workers." (AR 67.) Plaintiff reported that she was able to cook, do laundry, clean the house, go for frequent walks, go grocery shopping, do yard work, and socialize with friends and family. (AR 135-49, 183-90.) The record also showed that she took care not only of herself but of her mother as well.[12] (AR 23, 210, 249, 289-90, 292-93, 294-95, 332.) That Plaintiff's allegations of disabling mental illness were inconsistent with her daily activities was a valid reason for the ALJ to discount her testimony. See Molina, 674 F.3d at 1113 (ALJ properly found that plaintiff's extensive daily activities, "including walking her two grandchildren to and from school, attending church, shopping, and taking walks, undermined her claims that she was incapable of being around people without suffering from debilitating panic attacks").

Because the ALJ gave clear and convincing reasons for his credibility finding and those reasons were supported by substantial evidence, the Court "may not engage in second-guessing." Thomas, 278 F.3d at 959 (citation omitted). Plaintiff is not entitled to reversal on this claim.

VI.   CONCLUSION

Consistent with the foregoing, and pursuant to sentence four

---

[12]   Given these activities, Plaintiff's claim that she could not lift or carry even 10 pounds (AR 187) was not credible, particularly given that she had no physical impairments other than obesity (AR 203, 211, 225).

of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED:    July 12, 2013                **JEAN ROSENBLUTH**

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[13]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

43